UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DEBRA BADER,

Plaintiff,

-against-                                    6:11-CV-0882 (LEK/DEP)

SPECIAL METALS CORPORATION;
WILLIAM FARLEY; KEITH DABBS;
DAVE MARACEK; and JOHN DOE(S),

Defendants.

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

This action arises out of Plaintiff Debra Bader's ("Plaintiff") former employment with

Defendant Special Metals Corporation ("SMC").  Plaintiff brings claims under: (1) the Age

Discrimination in Employment Act ("ADEA"), 29 U.SC. § 621 et seq.; (2) Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; (3) the New York Human Rights Law

("HRL"), N.Y. EXEC. LAW § 290 et seq.; and (4) New York contract law.  See Dkt. No. 4

("Complaint") ¶¶ 27-67.  SMC and individual Defendants William Farley ("Farley"), Keith Dabbs

("Dabbs"), and Dave Maracek ("Maracek") (collectively, the "Individual Defendants";[1] collectively

with SMC, "Defendants") have moved for summary judgment.  Dkt. No. 22 ("SJ Motion"); see Dkt.

Nos. 22-1 at 1-38 ("Memorandum"); 36 ("Response"); 40 ("Reply").  Plaintiff has moved to amend

her Complaint.  Dkt. No. 35 ("Motion to Amend"); see Dkt. No. 35-1 ("Proposed Amended

Complaint").  For the following reasons, the Motion to Amend is denied and the SJ Motion is

granted in part.

_____

[1] Plaintiff alleges that the Individual Defendants were her supervisors at SMC.  Compl. ¶ 8.

## II.    BACKGROUND

Plaintiff is a New York resident and was employed at the New Hartford, New York, facility of SMC, a division of Precision Castparts Corporation ("PCC"), during the period relevant to this action.  Compl. ¶ 2; Dkt. Nos. 22-11 ("SMF") ¶¶ 3-4, 6; 38 ("SMF Response") ¶¶ 3-4, 6.  From 1978 to the relevant period, she worked in SMC's Inspection Department, which ensures that SMC's metal alloys are manufactured to specification, errors are captured, and appropriate documentation is maintained about the products.  SMF ¶¶ 12-13, 37-38; SMF Resp. ¶¶ 12-13, 37-38.  While Plaintiff was an SMC employee, she was a member of the International Association of Machinists and Aerospace Workers and Local Lodge 2310 (the "Union"), which had a collective bargaining agreement ("CBA") with SMC.  SMF ¶¶ 5-6, 9; SMF Resp. ¶¶ 5-6, 9.  Any discipline imposed by SMC on Union workers was subject to CBA requirements.  SMF ¶ 25; SMF Resp. ¶ 25.  Discipline took several forms, including verbal counseling, written warning, suspension, and termination.  SMF ¶ 24; SMF Resp. ¶ 24.  Union workers could file grievances challenging discipline.  SMF ¶ 26; SMF Resp. ¶ 26.

SMC has a database of employee work records to track employee work histories.  SMF ¶¶ 28-29; SMF Resp. ¶¶ 28-29.  Each employee work record lists categories of reviews that may have been presented to an employee, *e.g.*, commendation, training, coaching, reminder, verbal counsel, and written warning.  SMF ¶ 30; SMF Resp. ¶ 30.  Employee work records were issued for Plaintiff during her employment at SMC, including for discipline.  SMF ¶ 40; SMF Resp. ¶ 40. These included: a reminder on February 19, 2008; a verbal counsel on March 16, 2009; two written warnings on February 17, 2010; two written warnings accompanied by a three-day suspension on March 1, 2010; and a written warning on April 13, 2010.  SMF ¶¶ 46-51; SMF Resp. ¶¶ 46-51.  The

Union filed grievances relating to the two written warnings issued on February 17, 2010, one of the written warnings issued on March 1, 2010, and the written warning issued on April 13, 2010. SMF ¶¶ 64-66; SMF Resp. ¶¶ 64-66. SMC also issued discipline to five male employees of the Inspection Department in 2010, including written warnings, suspensions, demotion, and "Last Chance Agreements" ("LCAs"). SMF ¶¶ 71-77; SMF Resp. ¶¶ 71-77.

Pursuant to Article 9.01 of the CBA, a disciplinary hearing regarding Plaintiff was scheduled for April 15, 2010, which Plaintiff states she did not attend. SMF ¶¶ 53-54; SMF Resp. ¶¶ 53-54. Plaintiff was then issued a ten-day suspension with a return-to-work date of April 27, 2010. SMF ¶¶ 52, 55; SMF Resp. ¶¶ 52, 55. SMC also proposed that Plaintiff sign an LCA, which she declined to do. SMF ¶¶ 56-57; SMF Resp. ¶¶ 56-57. The Union filed a grievance relating to the ten-day suspension and the request that Plaintiff sign an LCA. SMF ¶ 66; SMF Resp. ¶ 66. Plaintiff did not return to work on April 27, 2010, or thereafter. SMF ¶ 59; SMF Resp. ¶ 59.

SMC maintains an anti-harassment policy, and its parent company, PCC, maintains a "Code of Business Conduct and Ethics," which includes a nondiscrimination statement. SMF ¶¶ 78-79, 81; SMF Resp. ¶¶ 78-79, 81. Plaintiff received a copy of the PCC Code on February 13, 2007. SMF ¶¶ 79-80; SMF Resp. ¶¶ 79-80. During the relevant period, PCC employed a service called "EthicsPoint," which enabled SMC employees to complain, via telephone or the Internet, about potential violations of the PCC Code, other company policies, or the law. SMF ¶¶ 83-84; SMF Resp. ¶¶ 83-84. Plaintiff used this service on July 9, 2009, to file a complaint. SMF ¶ 85; SMF Resp. ¶ 85. Sometime in the next few weeks, Plaintiff received a telephone call from SMC's Division Director of Organizational Development Dan Dohar ("Dohar"), who spoke to her for approximately half an hour. SMF ¶¶ 86, 88; SMF Resp. ¶¶ 86, 88. On September 20, 2009,

Plaintiff received a response through the EthicsPoint system stating, among other things, that neither her concerns nor interviews conducted as part of a review of her concerns indicated harassment, discrimination, or other violation of company policies, or that she was being targeted for discipline or termination. SMF ¶ 89; SMF Resp. ¶ 89.

On April 22, 2010, Plaintiff, or a former SMC employee on her behalf, filed another EthicsPoint report. SMF ¶ 91; SMF Resp. ¶ 91. SMC's Vice President for Human Resources responded to Plaintiff's report on April 27, 2010, noting that the Union had already filed grievances on Plaintiff's behalf regarding her concerns. SMF ¶¶ 92-93; SMF Resp. ¶¶ 92-93. On April 29, 2010, Plaintiff submitted medical documentation that she could not return to work until further notice due to carpal tunnel syndrome in her left wrist. SMF ¶ 62; SMF Resp. ¶ 62. On June 21, 2010, the Union advised SMC that it would not proceed to arbitration on Plaintiff's grievances because she was on medical leave of absence. SMF ¶ 68; SMF Resp. ¶ 68.

Plaintiff then filed a complaint with the New York State Division of Human Rights ("Division") on December 14, 2010. SMF ¶ 94; SMF Resp. ¶ 94; see also Dkt. No. 35-8 ("Division Complaint"). The Division Complaint was dismissed for administrative convenience on February 1, 2011, and the U.S. Equal Employment Opportunity Commission ("EEOC") issued Plaintiff a Notice of Right to Sue on April 4, 2011. SMF ¶ 95; SMF Resp. ¶ 95. Plaintiff commenced an action in New York Supreme Court, Oneida County, on June 22, 2011, which Defendants removed to the Court pursuant to 28 U.S.C. § 1441 on July 7, 2011. See Dkt. No. 1. Plaintiff filed her Complaint with the Court on September 9, 2011. Thereafter, on October 18, 2011, Plaintiff sent SMC a letter declaring her "intention to retire from employment at SMC-New Hartford; effective October 28, 2011." SMF ¶ 69; SMF Resp. ¶ 69. SMC sent a confirmatory letter, dated October 24, 2011, which

4

Plaintiff countersigned.  SMF ¶ 70; SMF Resp. ¶ 70.

## III.  MOTION TO AMEND

### A.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 15(a)(1) a party may, within certain defined time periods, amend a pleading as a matter of course.  If amendment as a matter of course is not permitted, a pleading may be amended only if the opposing party consents in writing or the court grants leave.  See FED. R. CIV. P. 15(a)(2).  Generally, a court "should freely give leave when justice so requires."  Id.  However, Federal Rule of Civil Procedure 16(b) requires the issuance of scheduling orders that "must limit the time to . . . amend the pleadings."  Such scheduling orders "may be modified only for good cause."  Id.  Thus, when a motion to amend is made after a scheduling order's deadline for doing so has expired, "the lenient standard under Rule 15(a) . . . must be balanced against . . . Rule 16(b)."  Grochowski v. Phoenix Constr., 318 F.3d 80, 87 (2d Cir. 2003).  There is good cause for permitting modification of pleading-amendment deadlines where the party moving for modification has been diligent in doing so.  Id.  "[G]ood cause may not be established where the facts underlying the claim were known to the plaintiff at the time the action was filed."  Alexander v. Westbury Union Free Sch. Dist., 829 F. Supp. 2d 89, 118 (E.D.N.Y. 2011).  "Moreover, while the absence of prejudice to a non-moving party may be relevant in determining whether leave to amend should be granted under Rule 15(a), it does not fulfill the 'good cause' requirement of Rule 16(b)."  Carnrite v. Granada Hosp. Group, Inc., 175 F.R.D. 439, 446 (W.D.N.Y. 1997) (quotation marks omitted).

### B.  Discussion

On December 1, 2011, the honorable David E. Peebles, U.S. Magistrate Judge, entered an

Order setting a March 1, 2012 deadline for pleading amendments and an August 31, 2012 deadline for the completion of discovery. See Dkt. No. 13 ("Scheduling Order"). The discovery deadline was then extended until December 31, 2012; the pleading-amendment deadline was never extended. See Text Order of November 16, 2012. See generally Dkt.

Plaintiff filed her Motion to Amend on April 9, 2013. She seeks to add new allegations regarding the protected activity for which she was allegedly retaliated against by Defendants. See Proposed Am. Compl ¶¶ 9, 11, 52, 61. Specifically, she seeks to add allegations that she was retaliated against after she: (1) complained to the Union about her supervisor Brian Allen's ("Allen") "sexually charged, offensive, and crude remarks"; and (2) was named as witness and deposed in her former coworker Linda DiFillippo's ("DiFillippo") discrimination lawsuit against SMC ("the DiFillippo Action"). Id. ¶¶ 9, 11. In support of the Motion to Amend, Plaintiff's attorney submits an affidavit in which she argues that: (1) Defendants will not be prejudiced by the amendments; (2) the amendments will not cause any delay; (3) the Motion to Amend is not brought in bad faith; and (4) the amendments are meritorious. Dkt. No. 37 ("Bosman Declaration") ¶ 14.

Plaintiff waited until more than a year after the expiration of the pleading-amendment deadline, and more than thee months after the discovery period closed, to bring the Motion to Amend. She has offered no explanation for her delay. See generally id. All of the facts upon which the new allegations are premised were known to Plaintiff well before she filed the Motion to Amend. Plaintiff's counsel was undoubtedly aware by January 11, 2010, that Plaintiff had been named as a witness in the DiFillippo Action, as she herself did the naming: Plaintiff's counsel represented DiFillippo and served the Federal Rule of Civil Procedure 26 that identified Plaintiff as an individual likely to have information regarding DiFillippo's claims. Id. ¶ 6. Plaintiff was

certainly aware that she had complained to her Union about Allen's remarks. Further confirming Plaintiff and her counsel's knowledge is the August 2010 deposition of Plaintiff in the DiFillippo action, at which Plaintiff's counsel asked Plaintiff about her complaints to the Union regarding Allen's harassment.  See Dkt. No. 35-2 at 77-84.[2]

Yet despite being aware, even before she commenced this action, of the protected activity she now seeks to add to her Complaint, Plaintiff failed to move to amend in a timely fashion.  She has offered no explanation for this delay; she has not, for example, asserted that she did not learn she was retaliated against for this protected activity until after the amendment and discovery periods expired.  See generally Bosman Decl.  Plaintiff has not shown good cause for her delay.  The Motion to Amend is therefore denied.[3]

## IV.    MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Federal Rule of Civil Procedure 56 instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis

---

[2] The pagination corresponds to the page numbers assigned by ECF.

[3] Moreover, even if the Court were to overlook the dilatoriness with which the Motion to Amend was brought, it would still be denied as futile with respect to Plaintiff's Title VII and ADEA claims that she was retaliated against for her participation in the DiFillippo Action; as discussed infra, Plaintiff failed to exhaust her administrative remedies with respect to these claims.

for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows that there is no genuine dispute as to any material fact, the burden shifts to the nonmoving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in ruling on a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). "Courts are particularly cautious about granting summary judgment to an employer in a discrimination case where, more often than not, it is the employer's intent that is in question." Lawrence v. Thomson Learning, Inc., No. 05-CV-329, 2007 WL 1593270, at *14 (N.D.N.Y. June 1, 2007) (citing Gallo, 22 F.3d at 1224)); see also Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999) (instructing district courts to "be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination").

### B. Gender and Age Discrimination

Plaintiff brings ADEA and HRL claims for age-based disparate treatment and Title VII and HRL claims for gender-based disparate treatment. See Compl. ¶¶ 30-32, 39-41, 48-50, 57-59. All

of these claims proceed according to the familiar burden-shifting framework established in

McDonnell Douglas Corp. v. Greene, 411 U.S. 792 (1973).  See Maraschiello v. City of Buffalo

Police Dep't, 709 F.3d 87, 92-93 (2d Cir. 2013); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93,

105-06 (2d Cir. 2010); Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n.9 (2d Cir.

2008).

   To make out a prima facie case of disparate treatment, a plaintiff must show that: (1) she is a

member of a protected class; (2) she was qualified for the position she held; (3) she suffered an

adverse employment action; and (4) the adverse action took place under circumstances giving rise to

an inference of discrimination.  Ruiz v. County of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010).

"A plaintiff's burden of establishing a *prima facie* case is *de minimis*."  Abdu-Brisson v. Delta Air

Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).  Once the plaintiff meets this minimal burden, the

employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action.

Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012).  Following this articulation, "the McDonnell

Douglas presumptions disappear from the case, and the governing standard is simply whether the

evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited

discrimination occurred."  James v. N.Y. Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000).  A court

may examine the "the strength of the plaintiff's prima facie case, the probative value of the proof

that the employer's explanation is false, and any other evidence that supports [or undermines] the

employer's case."  Id. (alterations in original and quotation marks omitted).

   *1. Prima Facie Case*

   Defendants do not dispute that Plaintiff is a member of a protected class by virtue of her age

and gender or that she was qualified for her position.  However, they argue that she cannot make out

9

a prima facie case of discrimination, because: (1) she was not subjected to any adverse employment action; and (2) even if she was subject to adverse employment actions, they did not take place in circumstances giving rise to an inference of discrimination.  See Mem. at 9-12; Reply at 19-21.

### a.  Adverse Employment Action

Only employment actions that are "adverse" are actionable under the ADEA, Title VII, and the HRL.  Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003).  "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  Id. at 138 (quotation marks omitted).  Adverse employment actions may include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  Patrolmen's Benevolent Ass'n v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002) (alteration in original and quotation marks omitted).

Plaintiff advances the following putatively adverse employment actions: (1) a January 2007 written warning; (2) a February 2007 written warning; (3) a February 2008 "Reminder"; (4) a March 2009 verbal counsel; (5) a June 2009 written warning; (5) two February 2010 written warnings; (6) two March 2010 written warnings; (6) a three-day suspension in March 2010; (7) a ten-day suspension in April 2010; (8) a Last Chance Agreement proposed on April 15, 2010; (9) a demotion and written warning on April 30, 2010; and (10) constructive discharge.[4]  See Resp. at 8-9. Defendants argue that none of these were adverse employment actions.  See Mem. at 9-11.

_____

[4] Plaintiff also brings separate claims for a hostile work environment, a type of adverse action.  These claims are discussed infra.

### i. Pre-2010 Discipline

Verbal and written warnings generally do not constitute adverse employment actions unless they lead to more substantial employment actions that are adverse. <u>See</u> <u>Tepperwien v. Entergy Nuclear Operations, Inc.</u>, 663 F.3d 556, 559-70 (2d Cir. 2011) (finding that an employee counseling was not actionable because it did not place the employee in a progressive disciplinary process); <u>Krishnapillai v. Donahoe</u>, No. 09-CV-1022, 2013 WL 5423724 (E.D.N.Y. Sept. 26, 2013) ("Courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (quotation marks omitted)).

In this case, all pre-2010 impositions of discipline were counselings or warnings and none served as the basis for future adverse employment actions. While Plaintiff alleges that each disciplinary act was "part of a progressive discipline system" that "allowed Defendants to increase the severity of the discipline," the deposition passage she cites for this proposition states that SMC does *not* have a progressive discipline system. <u>See</u> Resp. at 9; Dkt. No. 28 ("Dabbs Deposition") at 28. As discussed *infra*, Plaintiff's suspensions, demotion, and proposed LCA were premised on her 2010 written warnings; Plaintiff has offered no evidence that any of these adverse employment actions were also based on her pre-2010 discipline. Therefore, the pre-2010 disciplinary actions do not constitute adverse employment actions.

### ii. 2010 Suspensions

Defendants argue that Plaintiff's three- and ten-day suspensions do not constitute adverse employment actions because they were merely the "reasonable application of pre-existing disciplinary policies." Mem. at 10. As Defendants note, the Second Circuit has indicated that, at

least with respect to certain kinds of personnel actions, no adverse employment action occurs "where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006). But Defendants' argument that this principle renders Plaintiff's suspensions non-adverse is unavailing, for three reasons. First, the cases to which Defendants cite—Joseph and Brown v. City of Syracuse, 673 F.3d 141 (2d Cir. 2012)—despite containing seemingly broad dicta, dealt only with *paid* suspensions. See Brown, 673 F.3d at 151 ("[W]e reiterate today that a suspension with pay may sometimes rise to the level of an adverse employment action."); Joseph, 465 F.3d at 91("[A]dministrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action."). The Second Circuit suggested in Joseph that employment actions more grievous than paid suspensions might be inherently adverse and therefore not subject to the "reasonable enforcement of a preexisting disciplinary policy" standard. See Joseph, 465 F.3d at 90 ("Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." (quotation marks omitted)); see also Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 568 (S.D.N.Y. 2010) (interpreting Joseph's holding as "*placement on administrative leave with pay* in the discrimination context is not a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner" (emphasis added and quotation marks omitted)). Numerous cases decided after Joseph have not applied the "reasonable application of a preexisting disciplinary policy" standard to unpaid suspensions, which have been deemed *per se* adverse. See Porter v. Donahoe, No. 10 Civ. 3297, 2013 WL 4505409, at *8 (E.D.N.Y. Aug. 23,

12

2013) (holding plaintiff's unpaid suspension"obviously adverse"); <u>Delia v. Donahoe</u>, 862 F. Supp. 2d 196, 214 n.15 (E.D.N.Y. 2012) ("[T]he weight of authority from within this Circuit makes clear . . . that a plaintiff's unpaid suspension . . . constitute[s] [an] adverse employment action[]."); <u>Rupert v. City of Rochester</u>, 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010) ("A suspension without pay qualifies as an adverse employment action."); <u>Massie v. Metro. Museum of Art</u>, No. 06 Civ. 12905, 2010 WL 3749206, at *13 (S.D.N.Y. Aug. 17, 2010) (holding ten-day unpaid suspension an adverse employment action); <u>see also</u> <u>Faul v. Potter</u>, 355 F. App'x 527, 529 (2d Cir. 2009) (holding that material adversity of seven-day suspension changed from unpaid to paid could not be resolved at summary judgment).[5] Defendants have not argued or offered evidence that Plaintiff's suspensions were paid, and Plaintiff's hourly compensation indicates that they were not. <u>See</u> Dkt. No. 22-7, Ex. A ("CBA") Article 13. There is therefore sufficient evidence to find that the suspensions, even if they were the result of the reasonable application of a preexisting disciplinary policy, were adverse employment actions.

Second, even if the "reasonable application of a preexisting disciplinary policy" standard

---

[5] Defendants point to two cases where unpaid suspensions were found to not constitute adverse actions. <u>See</u> Mem. at 9-10. Not only are these cases against the weight of authority in the this circuit, they are inapposite. Both were premised on the suspensions' lack of impact on the plaintiffs' post-suspension employment. <u>See</u> <u>Gibson v. Wyeth Pharm., Inc.</u>, No. 07 Civ. 946, 2011 WL 830671, at *7 (S.D.N.Y. Mar. 9, 2011) (" [T]here is no dispute that [the plaintiff] returned to work and continued in the same position, with the same pay and under the same terms of employment, after the suspension."); <u>Dobrynio v. Cent. Hudson Gas & Elec. Corp.</u>, 419 F. Supp. 2d 557, 564-65 (S.D.N.Y. 2006) ("[B]eing suspended for a single day, with *no long term consequences whatever*, is not an actionable adverse employment action because it is not *material*." (first emphasis added)). Here, as discussed *infra*, the suspensions had lasting and permanent consequences: the three-day suspension led to the ten-day suspension, and both caused the LCA proffer and contributed to Plaintiff's constructive discharge. Moreover, in <u>Dobrynio</u>, the suspension was for merely a single day, and in <u>Gibson</u> the suspension may have been paid. <u>See</u> <u>Dobrynio</u>, 419 F. Supp. 2d at 564; <u>Gibson</u>, 2011 WL 830671, at *7.

applied to Plaintiff's unpaid suspensions, Defendants have not demonstrated that Plaintiff was disciplined pursuant to a preexisting disciplinary policy. Defendants state that Plaintiff received her first suspension because she had received three written warnings. See Dkt. No. 22-9 at 30-31 ("First Suspension Notice"); see Dkt. No. 22-7 ("Farley Declaration") ¶ 35; Resp. at 5. But they point to no preexisting policy requiring or contemplating a suspension after three written warnings. See generally Mem.; Reply. Nor do Defendants point to any preexisting policy requiring the imposition of the warnings upon which the suspension was based; at most, Defendants have demonstrated that they imposed a range of discipline on some of Plaintiff's coworkers for somewhat similar offenses and that some of the conduct for which Plaintiff was disciplined became a focus of SMC's quality-control efforts. See Reply at 18-19.

    As to the ten-day suspension, Defendants state merely that "[t]he Company decided it would suspend [Plaintiff]" and that the ten-day period was chosen because of "the number of disciplinary issues involving Plaintiff." Mem. at 5. Again, Defendants point to no preexisting disciplinary policy underlying their decisions. While the suspension notice states that Plaintiff was suspended per Article 9.01 of the CBA, see Dkt. No. 22-9 at 34-35 ("Second Suspension Notice"), that CBA provision merely lays out disciplinary investigation and hearing procedures as well as a general "just cause" discipline standard; it does not require or contemplate the suspension of an employee for five written warnings or touch upon the underlying conduct for which Plaintiff was disciplined. See CBA Article 9.01; cf. CBA Article 9.05 (mandating a three-day suspension after two written warnings for *absences*); Mugavero, 680 F. Supp. 2d at 568 (upholding jury finding of an adverse employment action where no evidence was offered as to whether the plaintiff's suspension was "normal procedure" under the defendant's disciplinary policies).

14

Finally, and most significantly, even if Plaintiff was disciplined pursuant to a preexisting disciplinary policy, Defendants have not demonstrated that the application of that policy was reasonable. Under Joseph and Brown, discipline applied discriminatorily is applied unreasonably. See Joseph, 465 F.3d at 93 n.1 (holding that placement on paid administrative leave because of race constitutes an adverse employment action, because the "terms and conditions of employment do not include the possibility that an employee could be suspended purely because of his or her race"); Brown, 673 F.3d 141, 151 (2d Cir. 2012) (holding that black plaintiff's suspension was not an adverse action because, *inter alia*, he failed to offer "proof of circumstances when a white officer . . . engaged in behavior comparable to his and was not suspended"); see also Lewis v. City of Buffalo Police Dep't, 311 F. App'x 417, 421 (2d Cir. 2009) (noting that, under Joseph, pretextual discipline is unreasonable); Mugavero, 680 F. Supp. 2d at 568 (affirming jury verdict that suspension was adverse where there was sufficient evidence to find that the discipline was discriminatorily applied); Hurt v. Donahoe, No. 07-CV-4201, 2011 WL 10526984, at *6 (E.D.N.Y. 2011) (finding application of preexisting disciplinary policies reasonable where they were uniformly applied). As discussed *infra*, Plaintiff has presented sufficient evidence for a reasonable factfinder to conclude that the suspensions were discriminatory. Defendants are therefore not entitled to summary judgment on the adversity of the suspensions.

### iii. February and March 2010 Warnings

Plaintiff's three- and ten-day suspensions in 2010 were premised on the four written warnings she received in February and March 2010. See First Suspension Notice; Second Suspension Notice. Thus, because the suspensions were adverse, the warnings were as well. See Aiello v. Stamford Hosp., No. 9-CV-1161, 2011 WL 3439459, at *13 (D. Conn. Aug. 8, 2011)

(holding that written warnings constituted adverse actions because the employee's termination was explicitly premised on those warnings); cf. Weeks v. New York, 273 F.3d 76, 86 (2d Cir. 2001) (finding insufficient evidence that notice of discipline constituted an adverse action where plaintiff did not "describe its effect or ramifications [and] how or why the effect would be serious").

### iv. April 30, 2010 Warning, Demotion, and LCA Proposal

Plaintiff argues that Defendants' LCA proposal, as well as a warning and accompanying demotion out of the Inspection Department on April 30, 2010, constitute adverse actions. See Resp. at 8-10. But Plaintiff never signed the LCA and it therefore never went into effect. The LCA thus never changed the terms and conditions of Plaintiff's employment and cannot constitute an adverse employment action. See Dkt. No. 35-3 at 41-42 ("Proposed LCA").[6] Likewise, Defendants have offered unrebutted evidence that Plaintiff's demotion, although proposed, never went into effect because she ceased working before she could be formally demoted. See Dkt. No. 40-6 ("Farley Reply Declaration") at 2, 4.[7] And because the warning was issued after Plaintiff had ceased working and never led to any formal disciplinary action, it too cannot constitute an adverse action.

### v. Constructive Discharge

However, the combination of the LCA proposal, uneffected demotion, other discipline, and a hostile work environment do give rise to a viable claim of constructive discharge. Constructive discharge occurs where an "employer, rather than discharging [an employee] directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Terry, 336 F.3d at 151-52. An employee need not show that an employer acted with the specific intent to cause the

---

[6] Had Plaintiff signed the Proposed LCA, she would have been subject to "immediate and automatic termination" upon any violation of an SMC rule. Proposed LCA ¶ 3(b).

[7] The pagination corresponds to the page numbers assigned by ECF.

employee to resign; rather, she need only show that the employer's actions were "deliberate and not merely negligent or ineffective." Petrosino v. Bell Atl., 385 F.3d 210, 229-30 (2d Cir. 2004) (quotation marks and alterations omitted).

Constructive discharge claims are often premised on the same type of non-discrete conduct underlying a hostile work environment claim, although the standard for constructive discharge is higher. Mandel v. Champion Int'l Corp., 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005); see also Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000) (denying summary judgment on hostile work environment claim but granting summary judgment on constructive discharge claim).

A demotion, particularly one that is accompanied by a significant loss of salary, prestige or responsibilities, or is otherwise "humiliating," may also, on its own, give rise to a constructive discharge claim. Pa. State Police v. Suders, 542 U.S. 129, 133 (2004); see also Goss v. Exxon Office Systems Co., 747 F.2d 885 (4th Cir. 1984) (finding sufficient evidence of constructive discharge where plaintiff sales representative was removed from prior territory); Alfieri v. SYSCO Food Svrs., 192 F. Supp. 2d 14, 24 (W.D.N.Y. 2001) (noting that constructive discharge may be found where an employee is threatened with demotion or has her duties changed); Dean, 119 F. Supp. 2d at 431 ("A demotion with a reduction in pay and loss of employee benefits, when accompanied by evidence of malicious intent, can establish constructive discharge."); Riedinger v. D'Amicantino, 974 F. Supp. 322, 330 (S.D.N.Y. 1997) (noting that constructive discharge may be based on a change to an employee's job title or responsibilities).

An employee is also constructively discharged where she resigns in the face of inevitable termination. See Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998)

17

("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired."); <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 85-89 (2d Cir. 1996) (finding that the plaintiff had been constructively discharged where, *inter alia*, she was told that "she would be fired immediately if, over the course of two years, she did not maintain satisfactory performance levels"); <u>Lopez v. S.B. Thomas, Inc.</u>, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding that supervisor's statement to plaintiff that he "would be fired at the end of the 90-day probationary period no matter what" was sufficient evidence to deny employer's motion for summary judgment on constructive discharge claim); <u>Silverman v. City of New York</u>, 216 F. Supp. 2d 108, 115 (E.D.N.Y. 2002) ("[A] number of courts in this circuit have held that threats of termination may be sufficient to establish constructive discharge."), <u>aff'd</u>, 64 F. App'x 799 (2d Cir. 2003). However, termination must be highly likely. <u>See</u> <u>Lopez</u>, 831 F.2d at 1188; <u>Adams v. Lucent Techs., Inc.</u>, 284 F. App'x 296, 302 (6th Cir. 2008) (finding that plaintiffs who chose to resign rather than face the possibility of layoffs were not constructively discharged because they "were not certain to lose their jobs"). An employees's subjective belief that termination is inevitable is not enough; rather, a constructive discharge claim will lie only where the "employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." <u>Kodish v. Oakbrook Terrace Fire Prot. Dist.</u>, 604 F.3d 490, 502 (7th Cir. 2010) (quotation marks omitted).

Here, Plaintiff has offered sufficient evidence that her harassment and the prospect of inevitable demotion and termination amounted to a constructive discharge. As discussed *infra*, Plaintiff has offered evidence of her frequent exposure to a variety of misogynist comments, conduct, drawings, and writings. Moreover, she has offered evidence that her supervisors were repeatedly made aware of this conduct, took no remedial action, and even expressed their approval

of the conduct. A reasonable factfinder could determine from Defendants' knowledge and response that, rather than being merely negligent, they intentionally permitted and encouraged the hostile work environment to which Plaintiff was subjected.

Although Plaintiff's demotion out of the Inspections Department was never effected, the language of the demotion notice indicates that it would have immediately taken effect had she returned to work. See Dkt. No. 35-3 at 44-45 ("Demotion Notice") ("Ms. Bader *is* permanently demoted from the Inspection Department." (emphasis added)).[8] Defendants have not offered any evidence to the contrary. This demotion would have significantly reduced Plaintiff's hourly wage, see CBA Article XIII (noting the significantly higher pay rate for employees in the Inspection Department than employees in the Utility Department, where Plaintiff had worked prior to her promotion), and led to her performing less prestigious and more menial tasks, compare Bader Dep. at 14 (noting that Plaintiff's tasks in the Utility Department included "sweeping" and "general utility work"); with id. at 15-18 (noting the technical complexity and importance of Plaintiff's work as an

---

[8] Defendants argue that, because Plaintiff did not mention this demotion in her Complaint, it should "not be considered as part of this case." Reply at 17-18. As discussed in greater detail *infra*, a plaintiff may not raise new claims or theories of liability for the first time in opposition to summary judgment and thereby prejudice a defendant by denying her the opportunity to conduct relevant discovery. Here, Defendants had the requisite notice that Plaintiff was, or might well be, pursuing a claim based on her demotion. The Complaint indicated that Plaintiff's discrimination claims were premised on, *inter alia*, discipline she received in early 2010. See Compl. ¶¶ 12-17. Rather than adding a truly "new" claim or different theory of liability, Plaintiff has clarified that her discrimination claim is also premised on a demotion that overlaps with the Complaint-enumerated discipline in terms of time, manner, and the supervisors who discovered Plaintiff's putative misconduct and decided to impose discipline. Moreover, Defendants received additional notice: at Plaintiff's deposition, she was asked about the putative misconduct that led to the April 30 warning and concomitant demotion. See Dkt. No. 27 ("Bader Deposition") at 126-30. Plaintiff clearly stated that her conduct had been proper and that discipline she had received had been discriminatory. See id. Defendants therefore had the requisite notice, and Plaintiff may bring a constructive discharge claim premised on the demotion.

inspector). Thus, this demotion alone might be sufficient to give rise to a constructive discharge claim.[9]

Plaintiff's reasonable perception that she would inevitably be terminated were she to sign the LCA and return to work also gives rise to a constructive discharge claim. As discussed *infra*, Plaintiff has offered sufficient evidence from which a factfinder could conclude that, in the two months prior to Defendants' LCA proffer, Plaintiff was given multiple discriminatory warnings, suspensions, and a demotion, and that an agent of Defendants, Plaintiff's coworker Joseph Sefcheck ("Sefcheck"), expressed glee at being able to ensure that she was "gone."[10] Dkt. No. 33 ("Geddes

---

[9] Defendants argue that Plaintiff has admitted that she was unaware of her written warning and corresponding proposed demotion until her deposition, which took place well after her retirement. See Reply at 17 n.8 (citing Dkt. No. 32 ("Bader Declaration") ¶ 63). If Plaintiff was unaware of the demotion, it could not be a basis for her constructive discharge claim because it could not have influenced her decision to retire. But in her declaration, Plaintiff stated merely that, at her deposition, the "written warning for allegedly reporting the wrong diameter on a product on February 27, 2010, was *presented* to me for the first time. I had never *seen it or received it."* Bader Decl. ¶ 63 (emphases added). Plaintiff did not state that she had previously been *unaware* of the written warning and its concomitant demotion; rather, she stated only that it had not been "presented" to her and she had never "seen it" or "received it." As a plaintiff's depositions and declarations must be construed in the "most favorable" light on a motion for summary judgment, Ibok v. Sec. Indus. Automation Corp., 369 F. App'x 210, 214 (2d Cir. 2010), this statement plausibly indicates that Plaintiff was aware of the warning and demotion but had not received a hard copy of the notice. This is entirely consistent with Plaintiff's deposition, at which she testified that she complained to the Union about the demotion-causing warning and that she believed the Union then filed a grievance. See Bader Dep. at 126-130.

[10] Plaintiff also asserts that she was told by a number of co-workers that Defendants were seeking to terminate her for pretextual reasons if she signed the LCA. Bader Decl. ¶¶ 36-38, 61. The reports from Plaintiff's coworkers, although admissible to demonstrate Plaintiff's belief that her termination was inevitable, see E.E.O.C. v. Univ. of Chi. Hosps., 276 F.3d 326, 333 (7th Cir. 2002), cannot be used as evidence that Defendants' conduct created that belief, because it would constitute inadmissible hearsay if used for that purpose, see Fed. R. Civ. P. 801; Murray v. Town of North Hempstead, 853 F. Supp. 2d 247, 270 (E.D.N.Y. 2012) (finding no constructive discharge where employee merely heard a rumor that supervisor wanted him terminated).

Declaration") ¶ 35.[11]  A factfinder could therefore determine that a reasonable employee in

Plaintiff's position would conclude that, were she to sign the LCA and return to work, Defendants

would inevitably and immediately find a pretextual excuse to impose discipline and trigger the

LCA's automatic-termination provision.  Cf. Chertkova, 92 F.3d at 89-90 (finding sufficient

evidence of constructive discharge where, *inter alia*, plaintiff was subject to arbitrary and

discriminatory treatment and told she would be "fired immediately" if her performance did not

improve).[12]

    The combination of the permitted and encouraged hostile work environment, pay- and

prestige-reducing demotion, and near-inevitable termination are enough for a reasonable factfinder

to conclude that Plaintiff was constructively discharged.  Cf. id. at 90. ("Certain factors, standing

alone are legally insufficient to support constructive discharge.  But the effect of a number of

---

[11] Defendants argue that Plaintiff has offered contradictory explanations for her resignation that undermine her constructive discharge claim.  See Reply at 19-20.  According to Defendants, Plaintiff stated at her deposition that she chose to resign to pursue retirement benefits, while she states in her declaration that she decided to resign because she was afraid of being terminated should she return to work.  See id. at 19-20 (citing Bader Dep. at 12-13; Bader Decl. ¶ 67).  But Plaintiff states in her declaration that she was afraid of being terminated *because of the concomitant loss of retirement benefits*.  See Bader Decl. ¶ 67.  At her deposition, she stated that, by retiring, she became eligible for retirement benefits, including health insurance—benefits for which she might not have been eligible had she returned to SMC and been terminated.  See Bader Dep. at 12-13. These are two sides of the same coin: retiring to avoid the loss of retirement benefits, and retiring to obtain retirement benefits.  While Plaintiff also states that she retired to obtain social security benefits because she was "broke," this bears on the timing of her resignation as opposed to her decision to retire rather than return to work.  Id.

[12] The two cases cited by Defendant on this point are inapposite.  See Reply at 20.  In Spence v. Maryland Casualty Co., 995 F.2d 1147, 1157 (2d Cir. 1993), the plaintiff was told, six months prior to his resignation, that he had come close to being fired but that he "would not be fired or reassigned."  The remainder of his employment was "uneventful," and he was never demoted.  Id. Likewise, in Katz v. Beth Israel Medical Center, No. 95 Civ. 7183, 2001 WL 11064 (S.D.N.Y. Jan. 4, 2001), the Plaintiff had not been demoted.  Moreover, in neither case was the employee subjected to a hostile work environment featuring the same type of offensive and explicit images and language at issue here.

adverse conditions in the workplace is cumulative."(citations omitted)).

### b. Inference of Discrimination

Defendants assert that Plaintiff has not demonstrated circumstances giving rise to an inference of discrimination. See Mem. at 11-12. "[T]he question of whether the plaintiff has met h[er] prima facie burden of demonstrating an inference of discrimination is often indistinguishable from the question of whether the employer's actions served merely as a pretext for some disguised discriminatory animus towards the plaintiff." Jimenez v. Donahoe, No. 10 CIV. 3289, 2013 WL 4836718, at *6 (S.D.N.Y. Sept. 11, 2013). Thus, "[d]espite the elaborate process set up in McDonnell Douglas, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis." Idrees v. City of New York, No. 04 Civ. 2197, 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) (citing cases). This is because a plaintiff who can prevail at the third stage of the McDonnell Douglas process has necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on her claim whether or not there exist circumstances giving rise to an inference of discrimination. To avoid redundancy, the Court will therefore assume Plaintiff has demonstrated an inference of discrimination and move on to the second and third stages of the McDonnell Douglas analysis. See Morris v. Ales Grp. USA, Inc., No. 04 CV 8239, 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007).

### 2. Articulated Non-Discriminatory Reason

Defendants have proffered the same non-discriminatory reason for each of the adverse actions at issue: Plaintiff was disciplined for performance and conduct issues. See Mem. at 11-12,

15-16.  The burden therefore shifts to Plaintiff to demonstrate that these reasons were pretext for discrimination.

### 3. Pretext

#### a.  February 17, 2010, Insubordination Warning

Plaintiff received a February 17, 2010, warning for verbally abusing a supervisor, Robert Wallace ("Wallace"), and making him feel uncomfortable.  Dkt. No. 35-3 at 23 ("February Insubordination Warning").  Plaintiff has offered evidence that a male employee repeatedly cursed, screamed, and threatened to kill this same supervisor and received no discipline.  See Geddes Decl. ¶¶ 19-21; Bader Decl. ¶ 39.  The failure to discipline this male employee for far more grievous verbal abuse is strong evidence of pretext.  See Ruiz, 609 F.3d at 493 ("A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination." (quotation marks omitted)).  Plaintiff also offers evidence that Wallace had previously disciplined her twice for the same conduct he regularly permitted male employees to engage in: reading and performing other non-work tasks in the Immersion Sonic Room.  See Bader Decl. ¶¶ 20-22; Geddes Decl. ¶¶ 15-20.  This too is strong evidence of pretext.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (noting that even non-actionable prior acts of discrimination may serve as background evidence of discrimination); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 176-77 (2d Cir. 2005) ("[R]elevant background evidence, such as . . . earlier decisions typifying the [discrimination] involved, may be considered to assess liability.").  Finally, Plaintiff denies that she made the insubordinate comments for which she was disciplined.  See Bader Decl. ¶ 39; Bader Dep. at 115-118.  Because some of the same managers who allegedly heard

Plaintiff's comments also made the decision to discipline her, a reasonable factfinder who credited Plaintiff's account over Defendants' would be all but compelled to determine that this warning was pretextual. See Feb. 17 Insubordination Warning; Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). While Defendants offer evidence that two male employees in the Inspection Department were disciplined for insubordination, this evidence is of limited probative value: the discipline took place well before Plaintiff's, and Defendants have not argued or shown that either of these employees engaged in conduct similar to Plaintiff's or were disciplined by the same supervisors. See Reply at 19. Thus, there is a genuine dispute of material fact as to whether the performance explanation for this warning was pretextual.

### b. February 17, 2010, Internal-Escape Warning

Plaintiff received another February 17, 2010, warning for permitting an internal escape—an inspector's improper approval of an inadequate product that is discovered and remedied at SMC's facility before it is sent to the customer. See Dkt. No. 35-3 at 25 ("February Escape Warning"); Mem. at 4 n.1. Plaintiff alleges that the product was actually adequate but she mistakenly marked it as inadequate. Bader Decl. ¶ 45. The warning notice appears to support her contention. See Feb. 17 Escape Warning. Plaintiff alleges that such typo-only internal escapes are common and were not met with warnings or discipline of any kind. Bader Decl. ¶¶ 41-42. While Plaintiff has not specifically identified any male employees who committed such typo-only internal escapes and were not punished, a factfinder could reasonably infer that some of the hundreds of unpunished internal escapes identified by Plaintiff's coworker Michael Geddes were typo-only. See Geddes Decl. ¶¶ 32-33. While Defendants have offered evidence that they disciplined other employees for internal

escapes, they have not shown that any of these were "typo," rather than "actual," internal escapes. See Mem. at 14-15; Dkt. No. 22-9, Exs. O-V. Defendants' discipline of Plaintiff in contravention of their standard practice is evidence of pretext. See Gallo, 22 F.3d at 1226-27 (finding sufficient evidence of pretext where employer's treatment of plaintiff violated its own practice); Bonura v. Chase Manhattan Bank, N.A., 795 F.2d 276, 277 (2d Cir. 1986) (same). Plaintiff has created a genuine dispute of material fact on whether the performance explanation for this warning was pretextual.

### c. March 1, 2010, IRR Warning

Plaintiff received a March 1, 2010, warning for failing to complete a required "IRR" form that was to accompany shipped product. Dkt. No. 35-3 at 27 ("March IRR Warning"). Plaintiff alleges that Wallace explicitly told her to ship the product without the IRR form. Bader Decl. ¶ 44. Wallace and other managers then disciplined Plaintiff for her failure to include the form. See March IRR Warning; Bader Decl. ¶ 44. Again, a reasonable factfinder who credited Plaintiff's version over Defendants' would be all but compelled to find that this discipline was pretextual: supervisors generally do not discipline employees for following orders. Moreover, Plaintiff asserts that Wallace, a male, received no discipline for instructing her to ship the product without the IRR form. See Bader Decl. ¶ 44. Defendants' failure to discipline Wallace for his related yet more grievous misconduct is evidence of pretext. See Ruiz, 609 F.3d at 493. Thus, Plaintiff has created a genuine dispute of material fact as to whether this warning was pretextual.

### d. March 2010 Internal-Escape Warning

Plaintiff received another March 1, 2010, warning for an actual, rather than a merely typographical, internal escape. See First Suspension Notice. Plaintiff acknowledges that she did

permit an internal escape and that this was a serious error. Bader Decl. ¶ 45. Moreover, Defendants

offer evidence of their increased focus on internal escapes and their concomitant meting out of

discipline. See Mem. at 14-15; Dabs Decl. ¶¶ 13-17. Thus, Plaintiff's conduct was an objectively

reasonable basis for imposing discipline.

Nevertheless, Plaintiff has presented sufficient evidence that this warning was pretextual

because it resulted from a discriminatory effort to scrutinize her work and thereby find a pretextual

reason to discipline her. The male inspector who discovered the internal escape, Sefcheck, relayed

his discovery of Plaintiff's mistake to other employees by announcing, with visible delight, "I got

her. I stuck it in her ass. I got her for the boys. She'll be gone." Geddes Decl. ¶ 35. A reasonable

factfinder could determine from Sefcheck's sexual and gender-animus-evincing language that he

had discriminatorily scrutinized Plaintiff's work so as to cause her termination. Cf. Staub v. Proctor

Hosp., 131 S.Ct. 1186, 1194 (2011) (finding supervisor's statement that she was "trying to 'get rid

of'" plaintiff evidence of animus).[13] A reasonable factfinder could infer from Sefcheck's comment

that he "got [Plaintiff] for the boys," as well as the other evidence of Individual Defendants'

discriminatory animus discussed *infra*, that one or more of the Individual Defendants had instructed

_____

[13] Pursuant to the "cat's paw" theory of liability, Defendants' decision to discipline Plaintiff might give rise to liability even if Defendants were unmotivated by discriminatory animus themselves and were uninvolved in Sefcheck's putatively discriminatory discovery and reporting of Plaintiff's error. See Staub, 131 S.Ct. at 1193 ("[I]f a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."(footnotes omitted)). Although it is unsettled whether the discriminatory animus of a coworker can give rise to cat's paw liability, see id. at 1194 (expressly declining to reach the issue), this issue need not be resolved here, because there is evidence that Defendants *were* involved in Sefcheck's putatively discriminatory investigation and discovery of Plaintiff's misconduct.

Sefcheck to find a pretextual reason to discipline Plaintiff.[14]   And where a disciplinary decision is

based on conduct that has been discovered as a result of scrutiny discriminatorily ordered by the

decisionmaker, the discriminatory animus motivating the scrutiny may be imputed to the

disciplinary decision itself.  Cf. Jordan v. Olsten Corp., 111 F. Supp. 2d 227, 236 (W.D.N.Y. 2000)

(noting that employer would not be entitled to summary judgment on discriminatory termination

claim if discriminatory animus motivated, *inter alia*, its decision to investigate plaintiff); Lopez v.

Cont. Ins. Corp., No. 95-CV-1894, 1997 WL 148032, at *3 (N.D. Tex. Mar. 25, 1997) (finding

adverse action was not discriminatory where plaintiff offered no evidence that discriminatory

animus "animated" the investigation that led to the discovery of the misconduct upon which the

adverse employment action was premised).

### e.  April 13, 2010, Warning

Plaintiff received a  fifth 2010 written warning for her failure to follow a supervisor's

instructions regarding the order of tasks she was to perform.  See Dkt. No. 35-3 at 32 ("April 13

Warning").  Plaintiff argues that her supervisor, Andy Winsemius ("Winsemius"), gave her

confusing directions and management failed to credit her verison of the directions she received over

her "young and inexperienced male" supervisor's version.  Bader Decl. ¶¶ 52-53.  Management's

failure to credit Plaintiff's account over Winsemius's is not evidence of pretext, especially because

Plaintiff has not alleged that male employees' version of events were usually credited over their

---

[14] Sefcheck's comment would not be hearsay even if offered as evidence that Defendants
discriminatorily ordered him to investigate Plaintiff.  If Sefcheck was acting on Defendants' orders,
he would be Defendants' agent, and his statement would therefore be admissible as that of a party
opponent.  See FED. R. EVID. 801(d)(2)(D).  Moreover, his statement would itself constitute
admissible evidence that he was acting in an agency capacity in investigating Plaintiff.  See Feis v.
United States, 394 F. App'x 797, 799 (2d Cir. 2010).

supervisors'. Plaintiff has therefore failed to create a triable issue of fact on whether this warning was pretextual.

### f. April 30, 2010, Warning

On April 30, 2010, Plaintiff was given a warning for not taking a sufficient number of measurements of an ingot and her resulting failure to report that the ingot's minimum diameter at its tapered bottom was undersized. See Demotion Notice. Plaintiff asserts that it is impossible to measure the tapered part of ingots because SMC does not have a tool with which to do so. See Bader Dep. at 70, 127. Plaintiff specifically states that a "pi tape," the tool she apparently assumes Winsemius used to measure the taper, cannot be used for that purpose, and that pi tape manufacturers have explicitly stated this in their manuals. Bader Decl. ¶ 64. She further alleges that the diameter of tapers was never measured in her thirty-two years at SMC. Id. at 129. Defendants offer no evidence to the contrary. Defendants' substantial departure from SMC practice in taking and relying upon the measurements underlying this warning is strong evidence of pretext. See Gallo, 22 F.3d at 1226-27; Bonura, 795 F.2d at 277. Plaintiff has therefore offered sufficient evidence that this warning was pretextual.

### g. Suspensions, Demotion, and Constructive Discharge

Plaintiff's suspensions, demotion, and LCA Proffer were premised on some or all of the six warnings she received in February, March, and April 2013. See First Suspension Notice (noting that Plaintiff was to receive a three-day suspension for her third written warning); Second Suspension Notice; Mem. at 10 (noting that Plaintiff's ten-day suspension was issued because of her prior written warnings); Demotion Notice (noting that Plaintiff's demotion was based on Article 9, Section 5 of the CBA, which provides that disciplinary demotions will only be used in the cases of

"repeated poor performance"); Proposed LCA (noting that Plaintiff's "latest infraction" warranted termination).  Because there is sufficient evidence upon which to find that five of these six warnings were pretextual, there is sufficient evidence to find that the suspensions and demotion were pretextual.  With respect to Plaintiff's constructive discharge claim, there is therefore sufficient evidence to find that, in the months before she ceased working, she was repeatedly warned, demoted, and suspended for pretextual reasons.

### 5. *Discriminatory Animus*

Defendants argue that, even if their proffered explanations for Plaintiff's discipline were pretextual, Plaintiff has not shown that they were pretext for discrimination.  See Mem. at 15-17.  But a finding of pretext may, on its own, be enough to support a finding of discrimination.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) ("[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."); James, 233 F.3d at 155.  Moreover, Plaintiff has produced substantial evidence of gender-based animus.  Sefcheck's comment that he "stuck it in [Plaintiff's] ass" for the "boys," if expressing the views of some or all of the Individual Defendants, certainly suggests gender-based animus.  So too does Plaintiff's extensive evidence, discussed *supra*,  of the differential treatment she and similarly situated male employees received.  Moreover, Defendants': (1) failure to remedy the sexually explicit and misogynist bathroom drawings, pornographic materials, and terms used to describe Plaintiff and other SMC employees; and (2) frequent participation in conversations where the words "slut," "whore," and "cunt" were used also constitutes evidence of animus.[15]  Bader Decl. ¶ 5; cf.

---

[15] This is true even though, as discussed *infra*, these drawings, materials, and comments are not actionable under Title VII and ADEA because Plaintiff failed to raise them in her Division Complaint.  Cf. Spell v. Conn. Office of Chief State's Att'y, 602 F. Supp. 2d 387, 392 (D. Conn.

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (finding that employer's failure to disclaim or correct sexist attitudes of partners permits inference of sex discrimination), superseded by statute on other grounds, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071; Robinson v. Runyon, 149 F.3d 507, 512-13 (6th Cir. 1998) (finding that evidence of a racially hostile atmosphere was admissible to illustrate animus of decisionmaker).[16]  Moreover, Plaintiff asserts that both Dabbs and Maracek spoke far more abusively to female employees than to male employees.  Bader Decl. ¶ 6, 15-16.  This substantial evidence of gender animus, combined with Plaintiff's evidence of pretext, is sufficient for a reasonable factfinder to conclude that Plaintiff's gender motivated the various adverse actions at issue.[17]

Plaintiff's evidence of age-based animus is nonexistent.  While she makes general

---

Mar. 17, 2009) (holding that even adverse actions for which the plaintiff had not exhausted his administrative remedies could be offered as background evidence); Walker v. N.Y.C. Dep't of Corr., No. 01 Civ. 1116, 2008 WL 4974425, at *17 (S.D.N.Y. Nov. 19, 2008) ("An uncharged discriminatory act cannot itself be the basis for Title VII claim, as the plaintiff would have failed to exhaust her administrative remedies; but it can serve as support for a separate, charged discriminatory act that forms the basis of a Title VII claim.").

[16] Defendants argue that Plaintiff admitted at her deposition in the DiFillippo Action that they were not motivated by gender-based animus.  See Mem. at 17.  Plaintiff was asked whether "women [we]re treated differently than men" at SMC and responded as follows:

> It depends upon—some.  There are some men that [have] issues there, but I think a lot of their problem there is it's people that are outspoken or people that are adamant union employees or people that know right from wrong . . . are treated differently from people that look the other way.

Dkt. No. 22-5 ("Butler Declaration"), Ex. D at 11.  Plaintiff's admission that union participation or outspokenness led to mistreatment by SMC management does not preclude the possibility of gender animus—an employee need not demonstrate a lack of any non-gender-based animus to prevail on a gender discrimination claim.

[17] However, because there is no individual liability under Title VII, see Butts v. City of New York, 990 F.2d 1397, 1401 (2d Cir. 1993), the Individual Defendants are entitled to summary judgment on Plaintiff's Title VII claim.

allegations that "younger" male employees were treated more favorably than she was, she does not provide the ages (or age ranges) of any specific comparator.  See generally Bader Decl.  Nor has she pointed to a single ageist comment or any ageist treatment of other employees.  Defendants are therefore entitled to summary judgment on Plaintiff's claims age-discrimination claims.

## C. Retaliation

To make out a retaliation claim under Title VII, ADEA, and the HRL, a plaintiff must show that: (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action.  See Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 698 (2d Cir. 2012) (quotation marks and alterations omitted).

### 1. Protected Activity

An employee engages in protected activity when she complains about or otherwise opposes conduct that she reasonably believes constitutes forbidden discrimination or retaliation.  See Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  "Complaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language."  Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. Jan. 11, 2007); see also Ramos v. City of New York, No. 96 CIV. 3787, 1997 WL 410493, at * 3 (S.D.N.Y. July 22, 1997) (holding that no "magic words" must be used).  "However, ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity."  Int'l Healthcare, 470 F. Supp. 2d at 357; see also Ramos, 1997 WL 410493, at *3 ("[T]he complaint must put the employer on notice that . . . discrimination is occurring." (citation omitted)).

Additionally, a plaintiff bringing an ADEA or Title VII claim must have exhausted her administrative remedies by setting forth her claims in a complaint with the EEOC or a qualifying state anti-discrimination agency.[18]  See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 82-83 (2d Cir. 2001).[19]  This requirement applies not only to causes of action but also to underlying factual allegations.  See Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003); McGuire v. U.S. Postal Serv., 749 F. Supp. 1275, 1287 (S.D.N.Y. 1990) (noting that the exhaustion requirement applies to "acts of discrimination"); see also Padilla v. Bechtel Const. Co., No. CV 06 286, 2007 WL 1219737, at *7 (D. Ariz. 2007) (finding exhaustion applicable to protected activity); Ingle v. Circuit City, No. 99-CV-1297, 2006 WL 6086293, at *2 (S.D. Cal. Feb. 6, 2006) (same).  "[P]recise pleading is not required for . . . exhaustion purposes."  Deravin, 335 F.3d at 201.  Thus, a plaintiff may bring claims not set forth in the administrative complaint if they are "reasonably related" to factual allegations in the complaint.  Holtz, 258 F.3d at 83.  A claim is reasonably related where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Butts, 990 F.2d at 1402 (quotation marks omitted).  "In this inquiry, the focus should be on the *factual allegations* made in the [administrative] charge itself, describing the discriminatory conduct about which a plaintiff is grieving."  Williams v. N.Y.C. Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006) (quotation marks omitted and emphasis added).

A similar requirement applies to claims or theories that a plaintiff attempts to raise on summary judgment that were not raised in her court complaint.  Certainly, a complaint need not

---

[18] The HRL does not require exhaustion of administrative remedies.  See Lumhoo v. Home Depot USA, Inc., 229 F. Supp. 2d 121, 136 n.13 (E.D.N.Y. 2002).

[19] "The exhaustion requirement exists to afford the administrative agency the opportunity to investigate, mediate, and take remedial action."  Prophete v. Ed Mitchell, Inc., No. 05-CV-0912, 2006 WL 1668024, at *2 (D. Conn. June 15, 2006).

include every fact upon which recovery is subsequently premised. See Boakye-Yiadom v. Laria, No. 09 CV 622, 2012 WL 5866186, at *11 n.14 (E.D.N.Y. Nov. 19, 2012). However, a party "may not raise new claims or theories of liability for the first time in opposition to summary judgment." Nagel v. County of Orange, No. 09-CV-9960, 2013 WL 1285465, at *5 (S.D.N.Y. Mar. 28, 2013). This rule serves to ensure that defendants are not prejudiced by conducting discovery on one theory of liability and then having to defend against a different theory. See Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (granting summary judgment and noting that, "at the very least, [a] plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense" (citation omitted)). Thus, this rule applies with significantly less force where a plaintiff provides some notice of her theory of liability before discovery has ended.

Plaintiff contends that she engaged in protected activity when she: (1) complained in 2007, both directly and through the Union, to management regarding harassment by supervisor Brian Allen ("Allen"); (2) repeatedly complained to management about a gender-based hostile work environment generally; (3) filed EthicsPoint reports on July 9, 2009, and April 22, 2010; and (4) was named as a witness and subsequently deposed in the DiFillippo Action. Resp. at 5. Defendants offer some combination of three arguments with respect to each: (1) Plaintiff's complaints or other conduct do not constitute protected activity; (2) Plaintiff did not exhaust her administrative remedies; and (3) Plaintiff failed to allege this protected activity in her Complaint.

### a. Allen Complaints

Defendants argue that Plaintiff failed to exhaust her administrative remedies with respect to the harassment complaints she made regarding Allen in 2007. See Mem. at 18-19. But Plaintiff's Division Complaint states that, in approximately 2007, she began to be subjected to a hostile work

environment and retaliated against, and that such harassment included members of management "demean[ing]" and "yelling" at her. Div. Compl. ¶ 1. She also alleges that, on other occasions, she complained both directly to SMC and through her Union about her treatment by management. See id. ¶¶ 2, 6, 7, 9. Plaintiff now seeks to base her retaliation claim on, *inter alia,* complaints she made to SMC, both through her union and directly to management, about Allen making "crude jokes" about her, her body, and her relationship with her husband, and his "*scream[ing] and yell[ing]* at her." Bader Decl. ¶¶ 7-10 (emphasis added). An administrative investigation prompted by the Division Complaint would reasonably be expected to encompass retaliation for Plaintiff's complaints about Allen, because: (1) the complained-of conduct took place at the same time, was carried out in largely the same fashion, and was committed by the same type of actor (management) as the conduct that was the subject of the Division Complaint-described complaints; and (2) Plaintiff's complaints regarding Allen's conduct were made in the same general manner as Division Complaint-described complaints.

Likewise, Plaintiff's failure to explicitly mention her complaints regarding Allen in the Complaint does not prevent her from bringing a retaliation claim. Plaintiff asserts in her Complaint that management began "yelling at," "disparaging," and "demeaning" her in 2007. Compl. ¶ 11. She also alleges that she frequently complained to SMC management about her treatment and "harassment" by supervisors. Compl. ¶¶ 10, 17. Moreover, Plaintiff's deposition gave Defendants notice that she was premising her retaliation claim on Defendants' response to her Allen complaints. See Bader Dep. at 66-70. Plaintiff may therefore premise her retaliation claim on her complaints regarding Allen. However, because Plaintiff's complaints regarding Allen covered only gender-based discrimination, she cannot premise her age-discrimination-based retaliation claims on this

protected activity.

### b.  Hostile Work Environment Complaints

Plaintiff also alleges that she made numerous complaints to supervisors regarding the gender-based hostile environment to which she was subjected by coworkers, including misogynist drawings and comments regarding Plaintiff and other female employees.  See Bader Dep. at 158-170.  As discussed *infra*, Plaintiff has presented sufficient evidence that the complained-of conduct constituted a hostile work environment.  Thus, her complaints regarding that conduct certainly constitute protected activity.

Plaintiff exhausted her administrative remedies with respect to the coworker-caused hostile work environment.  The Division Complaint indicates that Plaintiff was retaliated against for complaining about "hostile work environment" and "harassment" by "supervisors *and individuals*," thereby implicitly referencing coworker harassment.  Div. Compl. ¶ 7 (emphasis added).  The Division Complaint also points to specific complaints she made to both management and SMC's human resources department regarding that harassment.  Id. ¶¶ 2, 7.  Moreover, it details the adverse actions she now claims were retaliation for her harassment complaints.  See id. ¶¶ 3, 5, 6, 7. Defendants correctly note that the Division Complaint's allegations regarding Plaintiff's coworker-harassment complaints are conclusory, and that the only specific complaints she details covered *management* "demeaning" Plaintiff by yelling at her and making "false claims" against her.  Id. ¶ 1. Nevertheless, given the Division Complaint's general allusions to coworker-harassment complaints, its description of some specific complaints to management, and its detailed coverage of many of the retaliatory adverse actions at issue, an EEOC investigation arising from the Division Complaint might reasonably be expected to cover  retaliation for Plaintiff's complaints to management

35

regarding coworker harassment.  See Jute, 420 F.3d at 178 ("A complaint of retaliation could reasonably be expected to inquire into other instances of alleged retaliation *by the same actor*." (emphasis added and citation, quotation marks, and brackets omitted)).

The Complaint also sufficiently alludes to this protected activity.  It describes in detail the harassing conduct about which Plaintiff complained to management.  See Compl. ¶ 23.  It also discusses Plaintiff's frequent complaints to management and human resources regarding "hostile work environment" and other discrimination, as well as retaliation for those complaints.  Id. ¶¶ 10, 11, 13, 14, 17, 19.  Thus, the Complaint plausibly suggests that Plaintiff had complained about the hostile work environment and that she was, or might be, premising her retaliation claim on Defendants' retaliatory response.[20]

### c.  2009 EthicsPoint Complaint

Defendants argue that Plaintiff cannot premise her retaliation claim on her July 9, 2009, telephone EthicsPoint report because: (1) the report does not mention discrimination and therefore does not constitute protected activity; and (2) Plaintiff failed to mention the report in her Division Complaint or Complaint.  See Reply at 15; Dkt. No. 22-5 at 55-58[21] ("2009 EthicsPoint Summary").

#### i.  Reference to Discrimination

Plaintiff made her 2009 EthicsPoint report by phone.  See 2009 EthicsPoint Summary at 55

---

[20]  However, to the extent Plaintiff seeks to premise her retaliation claim on her 2009 complaints to her Union, which she alleges were subsequently relayed to SMC management, she cannot do so, because she has not shown that Defendants had the requisite notice of those complaints.  See Bader Decl. ¶ 17.  Plaintiff has failed to provide non-hearsay evidence that the Union members to whom she complained relayed her complaints to SMC or that, if they did so, they specifically complained about discrimination.  See Bader Decl. ¶ 17; Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999); Fed. R. Evid. 801-804.

[21]  The pagination corresponds to the page numbers assigned by ECF.

(noting that Plaintiff made her report to the "Call Center"); id. at 56 (describing Plaintiff's call). The person who received Plaintiff's call then prepared a written summary of that call. See 2009 EthicsPoint Summary. That summary does not include explicit allegations of discrimination. See id. Defendants treat this summary as dispositive. See Reply at 15. But Plaintiff now alleges that she complained about "unfair, discriminating and harassing treatment . . . and that there was a double standard for [Plaintiff] and other male employees in the Inspection Department." Bader Decl. ¶ 23. This double-standard allegation constitutes a discrimination complaint. See Bandhan v. Lab. Corp. of Am., 234 F. Supp. 2d 313, 320 (S.D.N.Y. 2002) (finding that Plaintiff's letter complaining of "double standards" constituted protected activity). Plaintiff also alleges that, in her follow-up meeting with Dohar regarding the report, she complained about Marecek's discriminatory monitoring of her bathroom visits. Bader Dep. at 109. Whether Plaintiff or the 2009 EthicsPoint Summary accurately describes Plaintiff's complaint is a disputed issue of fact unsuitable for resolution on summary judgment.[22]

Moreover, even the summary of the 2009 EthicsPoint report indicates that Plaintiff complained about discrimination. It notes that Plaintiff complained that four male supervisors had "intentionally been making her work environment unbearable" and that Plaintiff had been

---

[22] Defendants argue that Plaintiff's "self-serving statement[], inconsistent with the record evidence" regarding the substance of her 2009 EthicsPoint report is insufficient to withstand summary judgment . Reply at 15. The authority cited for this proposition, however, holds only that self-serving and *conclusory* affidavits are insufficient to defeat a motion for summary judgment. See BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996); Corazzini v. Litton Loan Servicing LLP, No. 09-cv-199, 2010 WL 6787231, at *7 (N.D.N.Y. June 15, 2010). Here, as discussed above, Plaintiff has offered non-conclusory allegations regarding the subject of the 2009 EthicsPoint report. Moreover, the "record evidence" in this case consists of nothing more than a single EthicsPoint operator's summary of Plaintiff's call. This is not an instance where a plaintiff's factual assertion is contradicted by such overwhelming evidence that no reasonable factfinder could credit the plaintiff's account.

"threatened various times" with suspension and termination. 2009 EthicsPoint Summary at 56.

Plaintiff also complained that she had been at SMC for thirty-two years but that her treatment had

worsened recently. Id. While Plaintiff failed to explicitly invoke "discrimination," her complaints

about severe mistreatment by four male supervisors and her reference to her many years of service

and recently worsening conditions plausibly constitute references to gender and age discrimination.

ii. Exhaustion of Administrative Remedies and Complaint Omission

Defendants argue that the Division Complaint's failure to mention the 2009 EthicsPoint

report or any "specific factual allegations of her opposition to unlawful age or gender discrimination"

renders her administrative remedies unexhausted. Mem. at 19. But the Division Complaint states

that Plaintiff had been retaliatorily suspended and offered an LCA in response to her *2010*

EthicsPoint report. Div. Compl. ¶¶ 7, 9.[23] Moreover, while the Division Complaint's specific

description of the substance of the 2010 EthicsPoint report is somewhat conclusory, context suggests

that it covered the discriminatory discipline detailed throughout the Division Complaint. See

generally Div. Compl. This is the same type of conduct Plaintiff alleges was the subject of her 2009

EthicsPoint report. An administrative investigation regarding retaliation for the 2010 EthicsPoint

report could reasonably be expected to encompass Plaintiff's previous, temporally proximate use of

that same system to complain about the same type of putatively discriminatory conduct.

For the same reasons, Plaintiff's failure to mention the 2009 EthicsPoint report in the

Complaint does not prevent her from premising her retaliation claim on that protected activity. The

Complaint explicitly discussed the 2010 EthicsPoint report and the ensuing retaliatory discipline and

LCA proffer. See Compl ¶ 17. The Complaint also indicated that Plaintiff "continuously"

---

[23] The pagination corresponds to the page numbers assigned by ECF.

complained about unfair discipline and scrutiny, and was retaliated against by being further disciplined. Id. ¶¶ 10, 11. The Complaint's discussion of the 2010 EthicsPoint report and other discrimination complaints was sufficient to put Defendants on notice that Plaintiff might be premising her retaliation claim on the 2009 EthicsPoint report. Plaintiff also gave Defendants additional notice before discovery ended. See Bader Dep. at 109. Thus, Plaintiff may premise her retaliation claim on this protected activity.

### d. 2010 EthicsPoint Report

Defendants argue that Plaintiff's 2010 EthicsPoint report also cannot constitute protected activity because it did not cover discrimination. Reply at 15. But in this email report, Plaintiff states that she is complaining about a "hostile workplace" and "ongoing harassment," terms that are often used in conjunction with gender-based discrimination. Dkt. No. 22-5 at 55-58 ("2010 EthicsPoint Email"). And all three supervisors about whom she explicitly complained, as well as a foreman who putatively "misrepresented" a conversation with Plaintiff, were male. Id. This raises the specter of gender discrimination. Moreover, Plaintiff states in her 2010 EthicsPoint report that the complained-of activity had been "ongoing for two years"—thereby implicitly referencing her 2009 EthicsPoint report that, as discussed supra, may have explicitly referenced discrimination. Thus, the 2010 EthicsPoint report's allegations that the April 13, 2013, warning and LCA offer were unfair and the result of "targeting" by her male supervisors can be read to allege gender-based discrimination. Defendants correctly note that the 2010 EthicsPoint report also mentions a "personality conflict"—a term inconsistent with discrimination—between Plaintiff and her supervisors. See, e.g., Davis-Bell v. Columbia Univ., 851 F. Supp. 2d 650, 678 (S.D.N.Y. Mar. 19, 2012) ("Mere personality conflicts must not be mistaken for unlawful discrimination." (quotation marks omitted)). However, Plaintiff

is a non-lawyer who used this term in a non-litigation context. In light of the other implicit references to discrimination, its use does not render her complaint unrelated to discrimination. Plaintiff may therefore bring retaliation claims premised on this protected activity. However, because Plaintiff's 2010 EthicsPoint report referenced only gender discrimination, she cannot premise her age-discrimination-based retaliation claims on this protected activity.

### e. DiFillippo-Action Participation

Plaintiff also seeks to premise her retaliation claim on the Federal Rule of Civil Procedure 26 disclosure of Plaintiff as a possible witness in the DiFillippo Action, as well as Plaintiff's subsequent deposition. See Resp. at 11-12. Plaintiff's Motion to amend the Complaint to include allegations of retaliation for this protected activity has been denied. As discussed *supra*, this does not necessarily preclude Plaintiff from bringing a retaliation claim based on her DiFillippo Action participation: a complaint need include every fact upon which recovery is subsequently premised. However, Plaintiff's failure to mention any remotely similar protected activity in the Complaint or otherwise give Defendants notice that she might be premising her retaliation claim on her DiFillippo Action participation does so preclude her. All of the protected activity Plaintiff described in her Complaint were complaints she made to the Union and SMC regarding treatment *she* received. See, e.g., Compl. ¶ 10 (noting that Plaintiff was retaliated against for complaining about the "disparate treatment against *her*" (emphasis added)); id. ¶ 34 (asserting that Plaintiff had been retaliated against for "complaining about and opposing discrimination on account of *her* age" (emphasis added)). Moreover, although Plaintiff did mention the DiFillippo action at her deposition, she did not hint that she was retaliated against for her participation. See generally Bader Dep. As neither Plaintiff's Complaint nor anything else gave Defendants, prior to the end of discovery, reasonable notice that

Plaintiff was or might be premising her retaliation claims on her participation in the DiFillippo Action, she cannot do so now.[24]

### 2. Materially Adverse Action

Retaliation is actionable only where it amounts to a materially adverse action—an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (quotation marks omitted). This is a similar, albeit "lesser standard" than the adverse-employment-action standard applicable to discrimination claims and discussed *supra*. Evarts v. S. New Eng. Tel. Co., No. CV 112, 2006 WL 2864716, at *10 (D. Conn. Oct. 2, 2006). Thus, the adverse employment actions discussed *supra* constitute materially adverse actions.[25]

### 3. Causation

A plaintiff may demonstrate causation by, *inter alia*, "showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence." Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quotation marks omitted). In general, a temporal gap of less than two months is sufficient to give rise to an inference of causation. See Mazurkiewicz v. N.Y.C. Health & Hosps. Corp., No. 09 Civ. 5962, 2010 WL 3958852, at *5 (S.D.N.Y. Sept. 16,

---

[24] Moreover, with respect to her ADEA and Title VII claims, Plaintiff failed to exhaust her administrative remedies regarding this protected activity. The Division Complaint does not even mention the DiFillippo Action, let alone Plaintiff's involvement. This protected activity is of an entirely different nature than the protected activity mentioned in the Division Complaint: complaints Plaintiff made regarding discriminatory treatment *she* was subjected to. See generally Div. Compl. An investigation regarding retaliation for the protected activity alleged in the Division Complaint would not reasonably be expected to cover Plaintiff's participation in the DiFillippo Action. See Padilla, 2007 WL 1219737, at *7; Ingle, 2006 WL 6086293, at *2.

[25] Although this is a lesser standard, the pre-2010 discipline is still insufficiently adverse to be actionable. See Risco v. McHugh, 868 F. Supp. 2d 75, 113 (S.D.N.Y. 2012) (finding counseling memoranda not materially adverse)

2010). However, even much longer gaps may be bridged by an intervening pattern of retaliatory treatment. See Jute, 420 F.3d at 175 (noting that earlier, non-actionable acts of retaliation occurring soon after protected activity could show a "chain of events" connecting the protected activity and subsequent adverse actions); Chan v. NYU Downtown Hosp., No. 03 Civ. 3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004) ("[E]vidence of an intervening pattern of antagonism between the complaint and her employer could support an inference that an alleged retaliatory act that was taken against the complainant was causally related to her complaint of discrimination."). Moreover, "[t]emporal proximity is just one method of demonstrating causation, and therefore the absence of temporal proximity does not demonstrate conclusively a lack of causation." Chan, 2004 WL 213024, at *3. Evidence of pretext may alone suffice to defeat summary judgment on causation. See Xu-Shen Zhou v. State Univ. of N.Y. Inst. of Tech., 499 F. App'x 105, 108-09 (2d Cir. 2012) (reversing grant of summary judgment to employer based on evidence of the falsity of defendants' termination explanations); Kessler v. Westchester Cnty. Dept. of Social Servs., 461 F.3d 199 (2d Cir. 2006) (same).

As discussed *supra*, Plaintiff did not suffer an adverse action until February 2010, more than three years after her 2007 complaints regarding Allen, approximately a year after her 2009 EthicsPoint report, and some time after many of her coworker-harassment complaints. However, she points to an intervening pattern of retaliatory conduct. She alleges that she received a written warning for "insubordination" and other discipline for making an allegedly false sexual harassment report soon after she complained about Allen. See Bader Decl. ¶¶ 12-14. This was then followed by a long period of intense criticism and observation by her supervisors, including numerous instances of Marecek spying on Plaintiff and criticizing her for taking too long in the bathroom. Id. ¶ 14.

Plaintiff was then repeatedly disciplined for conduct that the disciplining supervisor regularly permitted other employees to engage in.  Bader Decl. ¶¶ 20-22; Dkt. No. 22-9, Ex. F.

Plaintiff also alleges that she was disciplined a mere five days[26] after her 2009 EthicsPoint report.[27]  Bader Decl. ¶ 32.  And Plaintiff has offered evidence that she was given a pretetxual warning and demotion a mere eight days after her 2010 EthicsPoint report.  See Bader Decl. ¶ 64-65.  This temporal proximity is strong evidence of causation.  See Reed, 95 F.3d at 1178 (finding sufficient evidence of causation where a "mere" twelve days elapsed between plaintiff's protected activity and her termination).

Plaintiff offers substantial non-temporal evidence of causation. Sefcheck's "I got her for the boys" comment plausibly suggests retaliatory animus and causation.[28]  So too does the ambiguous comment from the SMC vice president who reviewed Plaintiff's 2010 EthicsPoint report that Plaintiff should "reconsider."  2010 EthicsPoint Email; Mem. at 7.  Most significantly, as discussed *supra*, Plaintiff has offered significant evidence that Defendants' proffered explanations for the materially adverse actions at issue were pretextual.  Plaintiff has therefore presented sufficient evidence for a reasonable factfinder to find causation.

---

[26] As evidence of a lack of causation, Defendants point to Plaintiff's acknowledgment that, after she made the 2009 EthicsPoint report, Defendants "pretty much left [her] alone" for four to five months.  Mem. at 20 (quoting Bader Dep. at 113-14).  But this brief period of tranquility began only after Plaintiff had been disciplined in the immediate wake of the report.

[27] Defendants correctly argue that this warning was not actionable, both because it was insufficiently adverse and because it was never formally "issued."  See Reply at 12 n.4.  But a disciplinary action taken a mere five days after Plaintiff's protected activity, even one that is non-actionable and not formally issued, may still be evidence of retaliatory animus

[28] Defendants correctly note that Plaintiff's descriptions of reports she received from co-workers regarding Defendants' retaliatory intentions are inadmissible hearsay.  See, e.g., Bader Decl. ¶¶ 36-38.

**D. Gender- and Age-Based Hostile Work Environment**

Plaintiff alleges that she was subjected to a hostile work environment due to her age and gender. See Compl. ¶¶ 27-29, 36-38, 45-47, 54-56. A hostile work environment constitutes an adverse employment action. See Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). "[T]he misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Id. at 374 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). A hostile work environment is actionable "only when it occurs because of an employee's sex, or other protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Moreover, a plaintiff must demonstrate a specific basis for imputing the hostile work environment to her employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997).

*1. Severity and Pervasiveness*

In order to demonstrate that the conduct to which she was exposed was sufficiently severe or pervasive, a plaintiff may show that "a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (citation and quotation marks omitted), superseded by statute on other grounds, Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85. "[C]ourts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." Rivera, 702 F.3d at 693 (citation, quotation marks, and alterations omitted).

In this case, Plaintiff details a variety of appalling misogynist conduct, including "offensive

and sexually suggestive" pictures throughout the plant, including pictures of penises;[29] comments

from male co-workers informing Plaintiff that she had "made the walls" by having sexually

suggestive comments written about her in the men's bathroom;[30] repeated offensive comments about

Plaintiff written on other walls, including instructions to call Plaintiff's telephone number "for a

blow job";[31] hard-core pornography magazines placed in Plaintiff's work area; pictures from such

magazines with employees' names written on them placed around SMC's facility; comments from

Plaintiff's paper-crown-wearing male coworkers that she was "Princess-Lots-of-Cock"; regular

exposure to misogynist terms including "slut," "whore," and "cunt"; and coworkers often calling

Plaintiff "the douche bag." Bader Decl. ¶¶ 4-5; Bader Dep. at 158-65. This conduct is similar to

conduct the Second Circuit has found to be sufficiently severe or pervasive to create a hostile work

environment.[32] See Williams v. Consol. Edison Corp. of N.Y., 255 F. App'x 546, 549 (2d Cir. 2007)

---

[29] Defendants imply that Plaintiff's admission that some drawings were removed renders the conduct at issue less severe or pervasive. Reply at 22. However, Plaintiff acknowledged only that the drawings were removed "after a few years." Bader Dep. at 157. Moreover, she indicated that, a week after these drawings were removed, they were "all back." Id. at 160. A one-week hiatus hardly renders these drawings significantly less severe or pervasive. Moreover, while Plaintiff admitted that offensive drawing on the ladies' room walls "came down" after she complained, she did not indicate that they remained down. Reply at 22. Even if they did, the other conduct at issue is more than sufficient to give rise to a hostile work environment claim.

[30] Defendants argue that Plaintiff offers only inadmissible hearsay regarding the contents of these writings. Reply at 22 n.11. But Plaintiff does not offer the comments from her coworkers "to prove the truth of the matter asserted," i.e., to prove that there were derogatory bathroom writings and that their content was as described. FED. R. EVID. 801. The comments from her coworkers regarding the writings were themselves harassing whether or not they were true. An employee told that there are offensive writing about her in the men's bathroom is no less affected if, unbeknownst to her, there are in fact no such writings.

[31] As Plaintiff states that she was "exposed" to this and other wall comments, the Court presumes that Plaintiff saw these comments herself. Bader Decl. ¶ 4.

[32] To the extent any of this conduct would otherwise be time-barred, Plaintiff has offered sufficient evidence that the continuing-violations exception applies: Plaintiff has alleged that much

(reversing grant of summary judgment where, *inter alia*, a supervisor "referred to [plaintiff] as a . . . bitch on more than one occasion"; male coworkers repeatedly used "offensive and derogatory terms for women, such as 'bitch' and 'cunt'"; and women encountered pornographic materials on several occasions); Petrosino, 385 F.3d at 222-23 (reversing grant of summary judgment to employer where plaintiff was routinely exposed to sexually offensive language, jokes, and graffiti that depicted women in a sexually demeaning fashion). Defendants argue, however, that the conduct was not sufficiently severe or pervasive because: (1) some of it was not "directed" at Plaintiff; and (2) Plaintiff has not described the conduct with sufficient detail. Reply at 20-23.

Defendants argue that the because some of the conduct and speech at issue was not directed at Plaintiff, that conduct and speech is "far less persuasive in establishing a hostile work environment claim." Reply at 23. This is incorrect. Highly offensive, inherently misogynist terms and images may reasonably be interpreted to demean *all* women, and therefore may dramatically affect an employee's working conditions even when not "directed" at her. See Petrosino, 385 F.3d at 222 (finding sufficient evidence of a hostile work environment even though many of the sexual insults and writings at issue were not directed at the plaintiff); Williams, 255 F. App'x at 549 ("Because a hostile work environment claim focuses on the nature of the workplace environment as a whole, evidence of racial and sexual harassment and hostility beyond what is directed specifically at the plaintiff is relevant to our analysis." (quotation marks omitted)); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 332 (4th Cir. 2003) (finding that "sex-laden and sexist talk and conduct," even though

---

of the conduct happened regularly until she stopped working for SMC. See Morgan, 536 U.S. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment claim may be considered by a court for the purposes of determining liability.").

not directed at plaintiff, were sufficiently severe or pervasive because they were "particularly offensive to women"); Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1522-23 (M.D. Fla. 1991) (holding that sexually provocative pictures of nude and partially nude women had "a disproportionately demeaning impact" on female employees and, as such, "convey[ed] the message that [women] do not belong"). As the Second Circuit has noted, a hypothetical situation in which an "'African-American plaintiff . . . [is exposed] to the daily use of the meanest racial slur against African-Americans'" well illustrates that offensive and bigoted language need not be "directed" at an employee to create a hostile work environment. Petrosino, 385 F.3d at 222-23 (quotation marks omitted). Moreover, as discussed *supra*, Plaintiff has pointed to numerous offensive comments and extensive conduct that were explicitly directed at her.

Defendants also incorrectly argue that Plaintiff's failure to specify the exact time, place, and actor for each and every incident is fatal to her claim. Reply at 21-23. Plaintiff was not required to work with a hammer[33] in one hand and an incident-recording notebook in the other. She has offered evidence of specific terms used, images drawn, identities or positions of putative harassers, and approximate time periods of certain types of conduct. Particularly because Plaintiff alleges that much of the conduct at issue occurred on a near-continuous basis over long time periods, this suffices. See Hawkins v. Groot Indus., Inc., No. 01 C 1731, 2003 WL 1720069, at *2 (N.D. Ill. Mar. 31, 2003) ("[Plaintiff] testified that he was subjected to racial epithets on a *daily* basis. Where a hostile work environment claim involves ongoing conduct, a plantiff need not date stamp every incident." (quotation marks omitted)); see also Williams, 255 F. App'x at 549 (reversing grant of summary judgment where certain types of harassing conduct occurred "more than once" or

---

[33] Plaintiff used a hammer, among other tools, at SMC. See Bader Dep. at 180.

"repeatedly"); <u>Dey v. Colt Constr. & Dev. Co.</u>, 28 F.3d 1446, 1457 (7th Cir. 1994) (finding sufficient evidence of hostile work environment even though plaintiff could not recall precisely what her supervisor had said or done on numerous occasions).

In addition to the explicitly gender-based coworker conduct discussed *supra*, Plaintiff points to mistreatment by her supervisors: Dabbs repeatedly yelled at her and told her to "shut up," and Marecek watched her, followed her, and criticized her for taking too long in the restroom. Bader Decl. ¶¶ 6, 14; Bader. Dep. at 107-10. Defendants argue that this conduct was not the result of gender-based animus. Reply Mem. at 23-24. But Plaintiff has offered substantial evidence regarding the animus of the two supervisors at issue with respect to the personnel actions discussed *supra*; a reasonable fact finder could impute that animus to their treatment of Plaintiff. Moreover, Plaintiff asserts that Dabbs did not speak to male employees in a disrespectful fashion and that Marecek belittled and screamed at another female employee but did not treat male employees likewise. Bader Decl. ¶¶ 6, 16. There is therefore sufficient evidence to conclude that this conduct was gender-based. This conduct and the discriminatory warnings and suspensions discussed *supra* contributed to the severity or pervasiveness of the hostile work environment. <u>See</u> <u>Rother v. N.Y.S. Dep't of Corr. and Cmty. Supervision</u>, No. 12-CV-0397, 2013 WL 4774484, at *6 (N.D.N.Y. Sept. 4, 2013) (Kahn, J.) (denying motion to dismiss based on allegations of, *inter alia*, "vigilant monitoring"); <u>Lamar v. Inst. for Family Health</u>, No. 09-CV-1154, 2011 WL 2432925, at *11 (N.D.N.Y. June 16, 2011) (denying motion for summary judgment based on, *inter alia*, evidence that "the monitoring of plaintiff's time . . . was, in fact, sex-based."), <u>aff'd</u>, 472 F. App'x 98 (2d Cir. 2012); <u>Pratesi v. N.Y.S. Unified Ct. Sys.</u>, No. 08-4828, 2010 WL 502950, at *11 (E.D.N.Y. Feb. 9, 2010) (finding plaintiff's allegations of harassing comments and discriminatory non-promotion sufficient to withstand a

motion to dismiss her hostile-work-environment claim); <u>Anderson v. Nassau Cnty. Dep't of Corr.</u>, 558 F. Supp. 2d 283, 295-96 (E.D.N.Y. 2008) (denying summary judgment on based on discriminatory statements, failure to promote, and improper discipline).  Plaintiff has therefore offered sufficient evidence of severity or pervasiveness.  However, because Plaintiff has offered no evidence that any of the conduct at issue was the result of age-, rather than gender-, based animus, her claims for age-based hostile environment must be dismissed.

*2. Exhaustion of Administrative Remedies*

Defendants correctly note that the factual basis of Plaintiff's Title VII hostile work environment claim is limited by the allegations in her Division Complaint.  <u>See</u> Mem. at 22-23.  The Division Complaint's specific allegations of harassment involve only members of management "demeaning" Plaintiff by yelling at her and making "false claims" against her.  Div Compl ¶ 1. Plaintiff now seeks to bring a hostile work environment claim based primarily on coworker's misogynist language and drawings.  These discriminatory acts are of a very different nature and were committed by different actors than the conduct raised in the Division Complaint.  Plaintiff's Title VII hostile work environment claim is  not exhausted with respect to this conduct, which therefore cannot serve as the basis for that claim.  <u>See</u> <u>Concey v. N.Y.S. Unified Court Sys.</u>, No. 08 Civ. 8858, 2011 WL 4549386, at *10-12 (S.D.N.Y. Sept. 30, 2011 (finding that, where plaintiff's administrative complaint focused on his treatment by his immediate supervisor, he had not exhausted his claims with respect to his discriminatory non-selection by other actors); <u>Colquitt v. Xerox Corp.</u>, No. 05-CV-6405, 2010 WL 3943734, at *5 (W.D.N.Y. Oct.7, 2010) (finding that administrative complaint's allegation of hostile work environment were not reasonably related to a claim for failure to promote); <u>cf.</u> <u>Jute</u>, 420 F.3d at 178.

Stripped of these allegations, Plaintiff's Title VII claim is premised on a single supervisor yelling at her and telling her to "shut up," another supervisor watching her and criticizing her for taking too long in the restroom, and the unfair and discriminatory disciplinary actions she received. The latter are discrete acts that may contribute and add context to, but cannot form the basis of, a hostile work environment claim. See Petrosino, 385 F.3d at 229 (holding that plaintiff could offer proof of her unsuccessful efforts to secure managerial positions "in support of" her hostile-work-environment claim); Locicero v. N.Y.C. Transit Auth., No. 06-CV-4793, 2010 WL 5135875, at *5 (E.D.N.Y. Dec. 9, 2010) (noting that "discrete instances" of unlawful discrimination are "different in kind from the repeated, harassing acts which are contemplated by the hostile work environment theory"). The yelling and monitoring are insufficiently severe or pervasive to give rise to hostile work environment claim, especially in light of Plaintiff's acknowledgment at her deposition that the monitoring may have been limited in time. See Bader Dep. at 107-09; Temple v. City of New York, No. 06 Civ. 2162, 2010 WL 3824116, at *6 (E.D.N.Y. Sept. 23, 2010) (finding plaintiff's allegations of excessive monitoring insufficient); Liburd v. Bronx Lebanon Hosp. Ctr., No. 07 Civ. 11316, 2009 WL 900739, at *8-9 (S.D.N.Y. Apr. 3, 2009) (finding that supervisor's reference to the plaintiff's "black ass" on multiple occasions, as well as his monitoring of plaintiff's whereabouts, did not amount to a hostile work environment); Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ. 2450, 1999 WL 796172, at *11 (S.D.N.Y. Sept. 30, 1999) (dismissing hostile work environment claim where supervisor told plaintiff to "shut up"); Grossman v. The Gap, Inc., No. 96 CIV. 7063, 1998 WL 142143, at *2 (S.D.N.Y. 1998) (dismissing hostile work environment claim where plaintiff alleged that her supervisor followed her around the workplace). Plaintiff's Title VII hostile work environment claim is therefore dismissed. Because the HRL does not require exhaustion of

administrative remedies, the limitations of the Division Complaint have no bearing on Plaintiff's HRL gender-based harassment claim.

### 3. Employer Liability

Defendants argue that, even if the conduct at issue was severe or pervasive enough to create a hostile work environment under the HRL, SMC is not liable. To impose liability on an employer for coworker harassment, a plaintiff must demonstrate negligence, *i.e.*, that her employer either: (1) failed to provide a reasonable avenue for complaint; or (2) knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action. Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009). A supervisor's notice of coworker harassment is imputed to the employer. See id. at 764-65. "If the employer is found to have been on notice of the sexual harassment, summary judgment is inappropriate where there is evidence that presents an issue of fact as to whether the employer's action was effectively remedial and prompt." Dawson v. County of Westchester, 351 F. Supp. 2d 176, 192 (S.D.N.Y. 2004) (quotation marks omitted).

Similarly, employers, who are otherwise liable for a hostile work environment created by a supervisor's conduct, have an affirmative defense, known as the Faragher/Ellerth[34] defense, to liability if they demonstrate that: (1) the hostile work environment did not culminate in a tangible employment action; (2) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (3) the employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer. Zakrzewska v. New Sch., 574 F.3d 24, 26 (2d Cir. 2009). Thus, an employer is liable for both coworker and supervisor harassment where it is aware of the harassment but fails to take prompt and effective remedial action.

---

[34] This affirmative defense was set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

Here, Plaintiff has offered sufficient evidence of SMC's notice and ineffective remedial action. According to Plaintiff, the Individual Defendants and other supervisors were acutely aware of the treatment she was receiving, either because they witnessed it first hand, see Bader Decl. ¶ 4 (noting that pictures of penises were drawn on the time clock and other "regularly frequented areas" and that it would therefore "not be possible for management to be unaware"); id. ¶ 5 (noting that Plaintiff frequently observed Maracek and Wallace participating in conversations where the words "slut," "whore," and "cunt" were used, including in reference to a fellow female employee), or because they were explicitly told about the conduct by Plaintiff, see Bader Dep. at 158 (noting that Plaintiff complained to her supervisors, including Wallace and Maracek, about penis drawings and offensive photographs placed around the workplace);[35] id. at 109 (noting that Plaintiff complained to Dohar about Maracek's monitoring of her bathroom visits); id. at 161 (noting that Plaintiff complained to a supervisor about offensive drawings in the women's room regarding a female coworker); id. at 163-64 (noting that Plaintiff complained to her supervisors that she was being called "the douche bag" by fellow employees); id. at 165 (noting that Plaintiff complained to a supervisor that she was being referred to as "Princess-Lots-of-Cock"); id. at 169-70 (noting that Plaintiff complained to Dan Dohar about a hostile work environment). As discussed in greater detail *supra*, Plaintiff has also offered evidence that she made formal hostile work environment complaints through the EthicsPoint system. See Bader Decl. ¶ 23 (alleging that her 2009 EthicsPoint report covered "harassing treatment"); 2009 EthicsPoint Summary (describing the "unbearable" work environment about which Plaintiff was complaining); 2010 EthicsPoint Email (stating that Plaintiff was a "victim of ongoing harassment").

---

[35] Plaintiff describes some of the persons to whom she complained as "foremen." She clarifies elsewhere the terms "foremen" and "supervisors" are interchangeable. Bader Dep. at 42.

Plaintiff has also offered sufficient evidence that Defendants did not take prompt or effective remedial action despite receiving notice. Defendants argue that their extant anti-harassment policy automatically renders their response adequate. Mem. at 26. This is not so. An employer's inadequate response to a complaint of harassment renders its remedial action ineffective whether or not it has such a policy. See Caridad v. Metro-N. R.R., 191 F.3d 283, 295 (2d Cir. 1999) (noting that such a policy is merely an "important consideration" and is not dispositive); Humphrey v. County of Nassau, No. 06-CV-3682, 2009 WL 875534, at *12 (E.D.N.Y. Mar. 30, 2009) (denying summary judgment on Faragher/Ellerth defense despite anti-harassment policy where there were factual disputes as to whether the employer "took sufficient action to promptly *correct* the discrimination" (emphasis added)). Defendants contend that they did respond effectively, but discuss their response only to Plaintiff's 2009 EthicsPoint report. See Reply at 26-27. In doing so, they ignore their woefully inadequate responses to Plaintiff's numerous complaints to her supervisors. Indeed, Plaintiff has offered evidence that most of her complaints were met with laughter; explicit approval of the harassing conduct; and either no, or wholly ineffective, remedial action. See, e.g., Bader Dep. at 158-59 (noting that supervisors would repeatedly respond to Plaintiff's complaints regarding sexually suggestive pictures and photographs in work areas by stating "[t]hat's a nice one, isn't it. He drew an especially nice one there, didn't he"); id. at 159-60 (noting that, at one point, the sexual drawings were removed from the facility's walls but returned within the week); id. at 164-65 (noting that the supervisor to whom Plaintiff reported that an employee was wearing a paper crown and calling Plaintiff "Princess-Lots-of Cock" laughed, proclaimed "[t]hat's a good one," and asked the offending employee to remove the crown). Moreover, there is evidence that the response to the 2009

EthicsPoint report was also inappropriate.[36]  Defendants assert that they performed an adequate

investigation that did not indicate that Plaintiff was being subjected to any gender-based harassment.

But given Plaintiff's evidence of: (1) the grievous, repeated, and highly visible nature of the

harassment; and (2) her numerous other complaints to supervisors regarding that harassment, a

reasonable fact finder could conclude that Defendants' failure to discover or remedy *any* gender-

based harassment renders their response inappropriate.[37]  Likewise, Defendants responded to

Plaintiff's 2010 EthicsPoint report by urging Plaintiff to "reconsider," failing to follow up with her,

and leaving the matter entirely to the grievance process.  Compl. ¶ 17; 2010 EthicsPoint Email.  A

factfinder could also deem this response inadequate.[38]

---

[36] Defendants suggest that Dohar's comportment in his follow-up conversation with Plaintiff—he was admittedly "very receptive, very nice and very concerned" during their conversation—constitutes effective remedial action.  Reply at 27 (citing Bader Dep. at 102-03).  This is not so.  While Dohar's behavior was certainly an improvement over that of supervisors who openly laughed at Plaintiff's complaints and celebrated the complained-of conduct, an employer who politely listens to an employee's complaints, but then fails to attempt to remedy the situation, has not taken effective remedial action.

[37] To the extent Defendants argue that the investigation's failure to unearth gender-based harassment is attributable to Plaintiff's failure to mention discrimination in her 2009 EthicsPoint report, see Reply at 26, there is, as discussed *supra*, a genuine dispute of material fact as to the subject of Plaintiff's report.

[38] Because Plaintiff has demonstrated the inadequacy of Defendants' remedial measures, she need not show that she took advantage of Defendants' reporting procedures.  Nevertheless, she has made such a showing.  Defendants assert that it is undisputed that "[Plaintiff] did not utilize the employer's anti-harassment reporting procedure" to report the  misogynist drawing and conduct.  Reply at 27.  This is not so.  As described by Defendants themselves, the SMC reporting policy provided that any acts of unlawful discrimination "must be reported immediately to a *supervisor*, *manager*, *or* human resources representative."  Reply at 26 (emphasis added) (citing Farley Decl. 10-11, Ex. C at 6-7).  As discussed *supra*, Plaintiff made numerous complaints to managers and supervisors about this conduct.  Defendants have pointed to no basis for their implied assertion that their reporting policy permitted *only* EthicsPoint reports.  Moreover, to the extent Plaintiff's coworkers were responsible for the language and drawings, she need not show that she utilized the reporting procedure; she need show only that Defendants had notice of the harassment.  As discussed *supra*, she has offered sufficient overwhelming evidence that Defendants had such notice.

## E. Breach of Contract

Plaintiff also brings a state-law contract claim alleging that SMC breached a variety of the CBA's provisions. Compl. ¶¶ 63-67. "Breach of contract claims founded directly on rights created by collective-bargaining agreements, or substantially dependent upon analysis of the terms of such agreements, are completely preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a)." Avedisian v. Quinnipiac Univ, 387 F. App'x 59, 62 (2d Cir. 2010) (quotation marks and citations omitted). Plaintiff's breach-of-contract claim is premised directly on CBA-created rights and is therefore preempted. Her claim "must either be treated as a § 301 claim, or [be] dismissed as pre-empted by federal labor-contract law." Vera v. Saks & Co., 335 F.3d 109, 114 (2d Cir. 2003) (quotation marks omitted). Even if the Court were to convert Plaintiff's claim into a § 301 claim, Defendants would be entitled to summary judgment. A Plaintiff generally must exhaust a CBA's grievance and arbitration procedures in order to bring a § 301 claim. See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 163 (1983); Cephas v. MVM, Inc., 520 F.3d 480, 485 (D.C. Cir. 2008). Here, Plaintiff has admittedly not done so. See Resp. at 24 (arguing that Plaintiff had not fully pursued her grievance and arbitration remedies because "[g]rievances are at an employee[']s discretion"); SMF Resp. ¶ 68 (admitting that the Union had not proceeded to arbitration on its grievances regarding Plaintiff's discipline).

However, there are three narrow exceptions to this exhaustion requirement where: (1) the employer has repudiated grievance mechanisms; (2) the union has breached its duty of fair representation ("DFR"); or (3) grievance and arbitration would be futile. Vera v. Saks, 208 F. App'x 66, 68 (2d Cir. 2006). Plaintiff cannot make out any of these exceptions. She argues that Defendants did not follow the grievance procedures, because no grievance hearing was scheduled

regarding her March 1, 2010, and April 13, 2010, warnings. Resp. at 24; Bader Decl. ¶ 68. But Defendants assert, and Plaintiff admits, that *the Union* decided not to proceed to arbitration on Plaintiff's grievances because of her medical leave. See SMF ¶ 68; SMF Resp. ¶ 68; Farley Decl. ¶¶ 45-48. Plaintiff provides no evidence of SMC's non-compliance with grievance procedures, and thus has fallen far short of demonstrating grievance repudiation.

Plaintiff also has not alleged, and cannot show, that the Union breached its duty of fair representation. To the contrary, she points to consistent support and advocacy by the Union on her behalf. See, e.g., Bader Decl. ¶¶ 10-11, 17, 55. Even if Plaintiff had alleged a DFR violation, her claim would be untimely. Section 301 claims premised on a union's DFR violation must be brought within six months of when the plaintiff "knew or reasonably should have known that a breach [of the duty of fair representation] has occurred." Ramey v. District 141, Int'l Ass'n of Machinists & Aerospace Workers, 378 F.3d 269, 278 (2d Cir. 2004). Here, Plaintiff did not file her Complaint until more than a year after she had ceased working for SMC and the Union decided not to pursue grievances regarding Plaintiff's discipline.

Finally, Plaintiff has offered no evidence that pursing her grievance and arbitration remedies would be futile; indeed, she has offered evidence that SMC employees have managed to successfully grieve LCAs and other discipline. See, e.g., Geddes Decl. ¶¶ 13, 55. Because Plaintiff did not exhaust the grievance and arbitration remedies available to her and cannot make out any of the exceptions to the exhaustion requirement, Defendants are entitled to summary judgment on the breach-of-contract claim.

## V.        CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Motion (Dkt. No. 35) to amend is **DENIED**; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 22) for summary judgment is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 22) for summary judgment is **GRANTED** with respect to Plaintiff's First Claim (ADEA hostile work environment); Second Claim (ADEA disparate treatment); Fourth Claim (HRL age-based hostile work environment); Fifth Claim (HRL age-based disparate treatment); Seventh Claim (Title VII hostile work environment); and Thirteenth Claim (breach of contract); and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 22) for summary judgment is **DENIED** with respect to Plaintiff's Tenth Claim (HRL gender-based hostile work environment); and it is further

**ORDERED**, that, to the extent Plaintiff's Third Claim (ADEA retaliation) and Sixth Claim (HRL age-discrimination-based retaliation) are premised on her 2009 EthicsPoint report, Defendants' Motion (Dkt. No. 22) for summary judgment is **DENIED**; and it is further

**ORDERED**, that, to the extent Plaintiff's Third Claim (ADEA retaliation) and Sixth Claim (HRL age-discrimination-based retaliation) are premised on other protected activity, Defendants' Motion (Dkt. No. 22) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that, to the extent Plaintiff's Third Claim (ADEA retaliation); Sixth Claim (HRL age-discrimination-based retaliation); Eighth Claim (Title VII disparate treatment); Ninth Claim (Title VII retaliation); Eleventh Claim (HRL gender-based disparate treatment); and Twelfth Claim (HRL gender-based retaliation) are premised on her April 13, 2010, warning; April 30, 2010, warning and demotion; or any pre-2010 discipline, Defendants' Motion (Dkt. No. 22) for summary judgment is **GRANTED**; and it is further

57

**ORDERED**, that, to the extent Plaintiff's Third Claim (ADEA retaliation); Sixth Claim (HRL age-discrimination-based retaliation); Eighth Claim (Title VII disparate treatment); Ninth Claim (Title VII retaliation); Eleventh Claim (HRL gender-based disparate treatment); and Twelfth Claim (HRL gender-based retaliation) are premised on her February 17 and March 1, 2013, warnings; her suspensions; and her constructive discharge, Defendants' Motion (Dkt. No. 22) for summary judgment is **DENIED**; and it is further

**ORDERED**, that, to the extent Plaintiff's Ninth Claim (Title VII retaliation) and Twelfth Claim (HRL gender-based retaliation) are premised on: (1) any aspect of Plaintiff's participation in the DiFillippo Action; or (2) Plaintiff's 2009 complaints to the Union, Defendants' Motion (Dkt. No. 22) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that, to the extent Plaintiff's Ninth Claim (Title VII retaliation) and Twelfth Claim (HRL gender-based retaliation) are premised on other protected activity, Defendants' Motion (Dkt. No. 22) for summary judgment is **DENIED**; and it is further

**ORDERED**, that, to the extent Plaintiff's Third Claim (ADEA retaliation); Eighth Claim (Title VII disparate treatment); and Ninth Claim (Title VII retaliation) are brought against the Individual Defendants, Defendants' Motion (Dkt. No. 22) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED:     December 04, 2013
           Albany, NY

Lawrence E. Kahn
U.S. District Judge

58